1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
          slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com
          aleslie@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| NEIL HAMMAN and MICHAEL STEWART, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>        v.<br><br>CAVA GROUP, INC.,<br><br>                Defendant. | Case No.   **'22 CV 0593 MMA MSB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
|---|---|

Plaintiffs Neil Hamman and Michael Stewart ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Defendant Cava Group, Inc. ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF ACTION

1. Plaintiffs bring this Class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's grain and salad bowls (the "Products"), which are unfit for human consumption because the packaging in which they are contained— and is essential and integral to delivering the Products to the consuming public[1]— contains heightened levels of fluorine which is independently unsafe and which is an indicator of further unsafe per- and polyfluoralkyl substances ("PFAS").[2]

2. PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[3]

3. In fact, scientists are studying—and are extremely concerned about— how PFAS affect human health. Consequently, the CDC outlined "a host of health

---

[1] Due to the integral and essential nature of the packaging, the term "Product" is used herein to denote both the Product and the Product's packaging.
[2] Discovery may reveal that additional Cava products are within the scope of this Complaint. Accordingly, Plaintiff reserves the right to include additional food products identified throughout the course of discovery.
[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.       Despite Defendant's representations to consumers that its products are "healthy," and "sustainable," including on its website and in-store signage, independent research conducted by Consumer Reports[5] determined that the Products packaging contains **508.3 parts per million (ppm) of total organic fluorine**, which is an indicator that the Product contains PFAS[6]

5.       Thus, based on Defendant's representations, a reasonable consumer would expect that the Products can be safely purchased and healthily consumed as marketed and sold.   However, the Products are not safe or healthy, posing a significant health risk to unsuspecting consumers.   Nor are the Products sustainable. Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiffs that their Products are unsafe, unhealthy, or harmful to the environment, contains heightened levels of fluorine indicating the presence of PFAS, or should otherwise be approached with caution.

6.       Accordingly, Plaintiffs bring their claims against Defendant individually and on behalf of a class of all other similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code §

---

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited Apr. 26, 2022).
[5] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited Mar. 30, 2022).
[6] According to Toxin Free USA, "organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources."   *See GMO Free v. CoverGirl Cosmetics, et al.*, Case No. 2021-CV-0046786B (D.C. Super. Dec. 20, 2021), Docket No. 1, ¶¶ 30-31.

1792, et seq. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, et seq.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had And Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation; (12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; and (14) Negligent Failure to Warn.

## THE PARTIES

7.     Plaintiff Neil Hamman is a natural person and citizen of California who resides in Ramona, California.  Plaintiff Hamman has purchased the Products from Defendant at numerous points over the past few years, including as recently as March 2022 from a Cava located in La Jolla, California.  Prior to his purchase, Mr. Hamman reviewed Defendant's marketing materials and in-store signage related to his Products, including those set out herein, including that the Products were healthy and sustainable.  Mr. Hamman understood that based on Defendant's claims, that Products were healthy, safe for consumption, and otherwise a sustainable product. Mr. Hamman reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Hamman suffered and continues to suffer, economic injuries.

8.     Mr. Hamman continues to desire to purchase the Products from Defendant.  However, Mr. Hamman is unable to determine if the Products are actually healthy, safe and sustainable.  Mr. Hamman understands that the composition of the Products may change over time.  But as long as Defendant continues to market its products as "healthy" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and

competitor's Products.  Mr. Hamman is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

9.     Plaintiff Michael Stewart is a natural person and citizen of California who resides in San Diego, California.  Plaintiff Stewart has purchased the Products from Defendant at numerous points over the past few years, including as recently as January 2022 from a Cava located in San Diego, California.  Prior to his purchase, Mr. Stewart reviewed marketing materials and in-store signage related to his Products, including those set out herein, including that the Products were healthy, safe, and sustainable.  Mr. Stewart understood that based on Defendant's claims, that Products were safe for consumption, and otherwise a sustainable product.  Mr. Stewart reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Stewart suffered and continues to suffer, economic injuries.

10.     Mr. Stewart continues to desire to purchase the Products from Defendant.  However, Mr. Stewart is unable to determine if the Products are actually healthy, safe, and sustainable.  Mr. Stewart understands that the composition of the Products may change over time.  But as long as Defendant continues to market its products as "healthy" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.  Mr. Stewart is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are

marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

11.     Defendant Cava Group, Inc. ("Defendant") is a foreign corporation with its principal place of business located in Washington, D.C..

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

13.     This Court has personal jurisdiction over Defendant transacts substantial business in this District, has substantial aggregate contacts with this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout this District, and purposefully availed itself of the laws of the State of California in this District, because the acts and transactions giving rise to this action occurred in this District.

14.     This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Food and Consumer Preferences**

15.     According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[7]  Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[8]

---

[7] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-

16.    At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[9]

17.    These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[10]

18.    Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[11]

19.    Thus, there is enormous incentive for companies such as Defendant to market their products as safe, healthy, and sustainable.  Indeed, Defendant has repeatedly and pervasively touted these considerations as reasons to purchase the Product over competitors, creating a context for consumers to believe that the Products are indeed safe, healthy, and sustainable.  Examples of these representations are included below.

20.    These include statements made directly on Defendant's website such as "We believe you shouldn't have to choose healthy over satisfying . . . And we work hard every single day to make sure that promise stands."[12]

---

food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited Mar. 30, 2021).
[8] *Id.*
[9] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-conent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).
[10] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited Mar. 22, 2022).
[11] Made Safe, "What Shoppers Want," at 3.
[12] Cava, "Cava Culture," https://cava.com/culture (last accessed Apr. 26, 2022).

21.   Defendant states on its website that "At Cava, we are about our impact on our communities and the world.  As a part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free."[13]  An image of this is included below:

August 5, 2020

## Eliminating PFAS From Our Food Packaging

At CAVA, we care about our impact on our communities and on the world at large. As part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free. We will eliminate PFAS from our food packaging by mid-2021, and will publicly share progress on our commitment in the year ahead.

22.   Defendant furthers its image as a go-to restaurant for healthy foods, stating directly on its website that it only uses "Simple Ingredients."  An example is included below:



---

[13] Cava, "Newsroom," https://web.archive.org/web/20220324103526/https://cava.com/newsroom (last accessed Apr. 26, 2022).

23.   Defendant also highlights these attributes in its in-store signage, stating that "Food . . . cannot be artificial" and that "Cava Grill is evolved to be smarter, healthier, and more transparent."  An example of this representation is set out below:



24.   To this point, Defendant also partnered with the marketing firm, Homestead, to "[d]evelop[] visuals" that convey its sentiment to consumers.  As Homestead tells it, "[l]ively colors and honest foods led to a series of in-store posters the promote the brand's mission," including those such as the following:

 



///

///

25.     Indeed, Cava's CEO, Brett Schulmann, also echoes Defendant's approach to food, noting that "[p]eople are eating out more, and they're seeking higher-quality ingredients.  When we take these naturally health nutritional profiles, great flavors, and fulfilling foods to a reasonable price point, we're solving a problem for a variety of consumers on the go."[14]

26.     Mr. Schulmann further remarked that a part of this requires "an atmosphere of transparency[.]"[15]

27.     Mr. Schulmann has also noted that Cava's "better for your body" and that "consumers are mindful about what they're ingesting[.]"[16]

28.     Mr. Schulmann has also stated that "At Cava . . . We want to show consumers that sustainable behavior can be the norm, easy, enjoyable and cost less."[17]

29.     Any doubt about Cava's attempt to boost its health and sustainable bona fides is dispelled by the in-depth profile of Cava written by Menus of Change, run by the Culinary Institute of America.  The organization wrote that "Cava Grill . . . targets health-conscious consumers," and "emphasizes local sourcing and the quality of what it sources.  The chain sells diners on transparency, simplicity, and purity."[18]

30.     Plaintiffs saw and relied on Defendant's marketing, including its in-store signage and website material outlined above in making their purchases.

---

[14] QSR, "What Inspires Cava CEO Brtt Schulman," (Oct. 2017), https://www.qsrmagazine.com/start-finish-what-inspires-execs/what-inspires-cava-ceo-brett-schulman (last accessed Apr. 26, 2022).
[15] *Id.*
[16] Gary Stern, "Cava: Healthy Mediterranean Chain Expanding And Acquiring," *Forbes* (Nov. 15, 2019), https://www.forbes.com/sites/garystern/2019/11/15/cava-healthy-mediterranean-chain-expanding-and-acquiring/?sh=3987bf901434 (last accessed Apr. 26, 2022).
[17] Suzanna Blake, "How Some Operators are Striving for Better Sustainability Standards," (Jan. 2022), https://www.qsrmagazine.com/content/how-some-operators-are-striving-better-sustainability-standards (last accessed Apr. 26, 2022).
[18] Menus of Change, "Cava Grill," https://www.menusofchange.org/case-studies/cavagrill (last accessed Apr. 26, 2022).

Plaintiffs believed that Defendant genuinely prioritized health, sustainability, and transparency, and did not expect that Defendant, who proudly touted these qualities, to hide the biggest secret of all:  the existence of unsafe levels of fluorine which is indicative of cancer causing PFAS in its packaging.

**B.    PFAS In Food Packaging Is Harmful To Humans And The Environment**

31.    On March 24, 2022, Consumer Reports released its study, "Dangerous PFAS Chemicals Are in Your Food Packaging."[19]

32.    Consumer Reports noted that "[t]o see how often PFAS are still found in food containers, Consumer Reports tested more than 100 food packaging products from restaurants and grocery chains."[20]

33.    Consumer Reports wrote that "Chains that promote healthier fare such as Cava . . . also had some packaging that contained PFAS[.]"[21]

34.    Consumer Reports noted that it "tested products for their total organic fluorine content, which is the simplest way to assess a material's total PFAS content. That's because all PFAS contain organic fluorine, and there are few other sources of the compound."[22]

35.    Indeed, this approach "is exactly what the food packaging industry does to determine whether PFAS w[ere] 'intentionally added' and can be composted or not."[23]

---

[19] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports* (Mar. 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last accessed Apr. 26, 2022).
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Ketura Persellin, "Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion," Environmental Working Group (Jan. 13, 2022), https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last accessed Apr. 26, 2022).

36.   The Biodegradable Products Institute ("BPI") has adopted 100ppm as a threshold.   Likewise, the Supply Chain Solutions Center ("SPSC") notes that it "recommends that companies systematically screen [their products] using a total fluorine method and investigate levels over 100 [ppm], which indicates intentional use."[24]

37.   SCSC notes that "[t]he total fluorine method measures all forms of PFAS in the fibers and does not identify individual PFAS.   It is an effective screening tool to detect intentionally added PFAS, and results should prompt a discussion with the supplier[.]"[25]

38.   Despite Defendant's representations noted above, that it's Products do not contain PFAS—which, according to Michael Hansen, PhD, senior scientist at Consumer Reports, "no company should tell consumers that their products are 100 percent free of PFAS"[26]—Defendant's Products contain a significant amount of organic fluorine which indicates intentional use of PFAS.   These results are as follows:



---

[24] Supply Chain Solutions Center, "Testing for PFAS in food packaging," https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/#:~:text=The%20total%20fluorine%20method%20provides,certification%20program% (last accessed Apr. 26, 2022).
[25] *Id.*
[26] *See supra* n. 5.

---

39.     These results are significant.  Because even if Defendant's Products did not contain PFAS, fluorine is independently worrisome.  According to the Technical University of Munich, "Fluorine is the most reactive chemical element and highly toxic."[27]

40.     Live Science confirms this, stating that "[w]hile small amounts of fluorine are essential for maintaining the strength of our bones and teeth, too much can have the reverse effect of causing osteoporosis or tooth decay, as well as potentially harming the kidneys, nerves, and muscles."[28]

41.     And Science Notes describes the effects of fluorine in more detail, noting that they are "comparable to those of pure chlorine, irritating eyes and mucous membranes and damaging the liver and kidneys."[29]

42.     A report published by Toxicology Mechanisms and Methods also notes that "[d]ue to its insatiable appetite for calcium, fluorine . . . likely represents a form of chemistry that is incompatible with biological tissues and organ system functions. Based on an analysis of the effects of fluorine demonstrated consistently in the literature, safe levels have not been determined nor standardized" but that "the National Research Counsel (NRC), offer[s] strong support for an immediate reconsideration concerning risk vs. benefit."[30]

---

[27] Technical University of Munich (TUM). "Fluorine: Toxic and aggressive, but widely used: Investigations with neutrons settle scientific dispute about the structure of solid fluorine." ScienceDaily. ScienceDaily, 27 March 2019. www.sciencedaily.com/releases/2019/03/190327112637.htm (last accessed Apr. 26, 2022).

[28] Rachel Ross, "Facts About Fluorine," Live Science (Aug. 21, 2018), https://www.livescience.com/28779-fluorine.html (last accessed Apr. 26, 2022).

[29] Ann Hemenstine, "What Is Fluoride? Fluoride vs. Fluorine" Science Notes (Sept. 30, 2021), https://sciencenotes.org/what-is-fluoride-fluoride-vs-fluorine/ (last accessed Apr. 26, 2022).

[30] Jeff Prystupa, "Fluorine – A Current Literature review. An NRC and ATSDR based review of safety standards for exposure to fluorine and fluorides," *Toxicology Mechanisms and Methods*, Vol. 21, Iss. 2 (2011), https://www.tandfonline.com/doi/abs/10.3109/15376516.2010.542931 (last visited Apr. 26, 2022).

43.     One source of measurement for safe levels is the U.S. Environmental Protection Agency's maximum limit of 4ppm for drinking water, noting that above that *fluoride* becomes problematic to human health once that level is surpassed."[31]

44.     The U.S. Public Health Service recommends a maximum of only 0.7ppm.[32]

45.     These are useful benchmarks as fluoride and fluorine have significant overlaps in their chemical properties, with the latter exposing humans and the environment to greater toxicity.[33]

46.     But, as noted, this is not the only concern with Defendant's Products. The dangers in the presence of fluorine does not end there as fluorine indicates the existence of PFAS, and it is beyond dispute that PFAS are harmful to the human body.   In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[34]

47.     The following figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[35]

///

///

///

---

[31] Association of State and Territorial Dental Directors, "Natural Fluoride in Drinking Water," https://www.astdd.org/docs/natural-fluoride-fact-sheet-9-14-2016.pdf (last visited Apr. 6, 2022).
[32] *Id.*
[33] Royal Society of Chemistry, "Fluorine," https://www.rsc.org/periodic-table/element/9/fluorine (last visited Apr. 6, 2022).
[34] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited Mar. 30, 2022).
[35] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Apr. 26, 2022).



48.    The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[36]

49.    In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

50.    As noted, the harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated by the figure below.[37]

///

---

[36] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Apr. 26, 2022).
[37] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Apr. 26, 2022).



51.     And, following their introduction, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.[38]

52.     All of these harms outweigh the simple reason PFAS are used in food packaging in the first place which is simply to act "as a barrier to keep grease from escaping" and "from leaking into people's hands."[39]

53.     But PFAS are not necessary for this intended outcome.   Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no levels of organic fluorine.[40]   Accordingly, Defendant would have

---

[38] *Id.*

[39] Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last accessed Apr. 26, 2022).

[40] *See supra* n. 5.

had knowledge that it could produce the Product packaging without the heightened levels of fluorine and PFAS inherent in its current composition.

54.     Yet, Defendant chose not to, and instead concealed and affirmatively misrepresented this information to consumers, to increase revenues by the cost savings associated with the use of these chemicals.

55.     This has not been without consequence to consumers, as fluorine and PFAS in food packaging migrates[41] onto the food, exposing consumers to both of these via ingestion.[42]

56.     Thus, Defendant's conduct has been substantially injurious to consumers, and is actionable.

**C.     Defendant's Misrepresentation and Omissions Are Actionable**

57.     Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as safe and sustainable when they are not in fact safe and sustainable.

58.     Plaintiffs and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product in packaging containing dangerous substances with well-known health and environmental consequences.

59.     No reasonable consumer would expect that a product marketed as safe and sustainable would pose a risk to their health, safety, and wellbeing, or that it would contain dangerous levels of fluorine and PFAS, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiffs

---

[41] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784 (last accessed Apr. 26, 2022).

[42] *See* Nat'l Toxicology Program, Per- and Polyfluoroalkyl Substances (PFAS), https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last accessed Apr. 26, 2022).

1   and Class Members suffered economic injuries as a result of purchasing the

2   Products.

3        60.    As the Products expose consumers to fluorine and PFAS that pose a

4   risk to consumers' health, the Products are not fit for consumption by humans.

5   Plaintiff and the Class are further entitled to damages for the injury sustained in

6   being exposed to high levels of fluorine and toxic PFAS, damages related to

7   Defendant's conduct, and injunctive relief.

8        61.    Moreover, because these facts relate to a critical safety-related

9   deficiency in the Products, Defendant was under a continuous duty to disclose to

10   Plaintiffs and Class Members the true standard, quality, and grade of the Products

11   and to disclose that the Products contained substances known to have adverse health

12   effects.  Nonetheless, Defendant concealed and affirmatively misrepresented the

13   Product, as discussed herein.

14        62.    Although Defendant is in the best position to know what content it

15   placed on its website and in marketing materials during the relevant timeframe, and

16   the knowledge that Defendant had regarding the fluorine and PFAS and its failure to

17   disclose the existence of fluorine and PFAS in the Product to consumers, to the

18   extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the

19   following facts with particularity:

20        63.   **WHO**:  Defendant made material misrepresentations and/or omissions

21   of fact about the Product through in-store, website representations, and marketing

22   statements, which include the statements that the Products are healthy, safe and

23   sustainable.  These representations constitute omitted material information regarding

24   harmful chemicals in the Products packaging which is essential and integral to

25   delivering the Products to the consumer.

26        64.   **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent

27   because they omitted and concealed that the Product contains substances—fluorine

28   and PFAS—that are widely known to have significant health repercussions.  Thus,

Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are healthy, safe, and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

65. **WHEN**: Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products packaging contained harmful substances.

66. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions in in-store, website representations, and marketing statements.

67. **HOW**: Defendant made material misrepresentations and/or failed to disclose material facts regarding the Product, including the presence of heightened levels of fluorine and PFAS.

68. **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

69. **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

**TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS**

70. Defendant would have had actual knowledge for years that the Products packaging contains harmful chemicals such as fluorine and PFAS.

71. Although Defendant was aware of the deception in its marketing and advertising given the inclusion of fluorine and PFAS in the Product despite claims of

the Product's healthiness, safety and sustainability, they took no steps to warn Plaintiff or Class Members of risks related to fluorine or PFAS in the Products.

72.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products.  Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

73.     Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Products are healthy, safe and sustainable.

74.     Defendant concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members.   Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

75.     The fluorine and PFAS included in the formulation, design and/or manufacture of the Product packaging were not reasonably detectible to Plaintiffs and Class Members.

76.     At all times, Defendant actively and intentionally concealed the existence of the fluorine and PFAS and failed to inform Plaintiffs or Class Members of the existence of the PFAS.  Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

77.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals.

78.     Defendant concealed or misrepresented the fluorine and PFAS for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

79.    As a result of Defendant's active concealment of the fluorine and PFAS and/or failure to inform Plaintiffs and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.   Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Product.

80.    Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Product contained heightened levels of fluorine and PFAS, which, at the very earliest, would have been in March 2022. Plaintiff and Class Members had no realistic ability to discern that the Product contained heightened levels of fluorine and PFAS until after the widely publicized Consumer Report's study.   Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of PFAS in the Product and of the Product's true nature.

## CLASS ALLEGATIONS

81.    Plaintiffs bring this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Products (the "Class").   Excluded from the Class are persons who made such purchases for purposes of resale.

82.    Plaintiffs also seek to represent a subclass of all Class Members who purchased the Products in the State of California (the "California Subclass"). Excluded from the California Subclass are persons who made such purchases for purpose of resale.

83.    As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

84.     At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members"). However, given the nature of the claims and the number Defendant's restaurants in the United States selling Defendant's Product, Plaintiffs believe that Class and Subclass Members are so numerous that joinder of all members is impracticable.

85.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

        (a)    whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

        (b)    whether Defendant's conduct was unfair and/or deceptive;

        (c)    whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

        (d)    whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

86.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as the California Unfair Competition Law.

87.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class Members, purchased, in a typical consumer setting, Defendant's Product, and Plaintiffs sustained damages from Defendant's wrongful conduct.

88.     Plaintiffs are adequate representative of the Class and Subclass because their interests do not conflict with the interests of the Class Members they seek to represent, have retained competent counsel experienced in prosecuting class actions,

1    and intend to prosecute this action vigorously.  The interests of the Class Members

2    will be fairly and adequately protected by Plaintiffs and their counsel.

3        89.    The class mechanism is superior to other available means for the fair

4    and efficient adjudication of the claims of Class Members.  Each individual Class

5    Member may lack the resources to undergo the burden and expense of individual

6    prosecution of the complex and extensive litigation necessary to establish

7    Defendant's liability.  Individualized litigation increases the delay and expense to all

8    parties and multiplies the burden on the judicial system presented by the complex

9    legal and factual issues of this case.    Individualized litigation also presents a

10   potential for inconsistent or contradictory judgments.  In contrast, the class action

11   device presents far fewer management difficulties and provides the benefits of single

12   adjudication, economy of scale, and comprehensive supervision by a single court on

13   the issue of Defendant's liability.  Class treatment of the liability issues will ensure

14   that all claims and claimants are before this Court for consistent adjudication of

15   liability issues.

### COUNT I
**(Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

18       90.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged

19   above.

20       91.    Plaintiffs bring this claim individually and on behalf of the California

21   Subclass against Defendant.

22       92.    California Business and Professions Code § 17200 prohibits "any

23   unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed

24   above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or

25   practices in violation of California Business & Professions Code § 17200.

26       93.    By committing the acts and practices alleged herein, Defendant has

27   violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§

28

17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

94.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

95.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers.  In addition, Defendant have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

96.     Plaintiffs and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

97.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.   Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

98.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein as noted above.

99.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.   Defendant's claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above,

were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

100.   Plaintiffs and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

101.   There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

102.   Plaintiffs and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

103.   The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other California Subclass Members.

104.   Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

## COUNT II
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),
California Civil Code § 1750, *et seq.*)
(Injunctive Relief Only)**

105.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

106.   Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

107.   Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

108.   Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

109.   Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

110.   Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as healthy, safe and sustainable, when in fact the Products are not healthy, safe, and sustainable and are instead, dangerous, and useless.

111.   The Products are not safe because they contain an extraordinary level of fluorine and PFAS in the packaging which is essential and integral to the delivery of the Products to consumers that subject unsuspecting consumers to significant health risks.

112.   Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiffs or California Subclass Members.

113.   Defendant made partial representations to Plaintiffs and California Subclass Members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as healthy, safe and sustainable, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health and the environment.  Moreover, Defendant affirmatively misrepresented the Product despite its knowledge that the Product was not as advertised.

114.   Plaintiffs and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

115.   On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).   The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.   The letter stated that it was sent on behalf of all other similarly situated purchasers.   Because of the gravity of the harm alleged, Plaintiffs has chosen not to wait for Defendant's response.   Plaintiff has also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein.   Accordingly, Plaintiff's letter would not have served the purpose of the letter.

116.   Accordingly, Plaintiffs and the California Subclass Members seek injunctive relief available under the CLRA.   Should Defendant choose not to remedy the situation within 30 days of the letter, Plaintiffs reserve the right to amend this complaint for damages and reasonable attorney's fees.

<u>**COUNT III**</u>
**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

117.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

118.   Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

119.   Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer

goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

120.   The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

121.   Plaintiffs and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

122.   Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

123.   Defendant impliedly warranted to retailer buyers that the Product was merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product is used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product was unsafe for consumption. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

124.   Plaintiffs and California Subclass Members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

125.   The Products were not altered by Plaintiffs or the California Subclass Members.

126.  The Products were defective at the time of sale when they it the exclusive control of Defendant.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

127.  Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

128.  As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

129.  On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter, apprising Defendant of its breach of warranties.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Because of the gravity of the harm alleged, Plaintiffs has chosen not to wait for Defendant's response.  Plaintiff has also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein.   Accordingly, Plaintiff's letter would not have served the purpose of the letter.

130.  Plaintiffs and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
### (Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq.*)

131.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

132.  Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

133.   Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.   As described above, and throughout this Complaint, Defendant misrepresented the Product as healthy, safe and sustainable when, in fact, the Product was not healthy, safe or sustainable.

134.   By its actions, Defendant disseminated uniform advertising regarding the Product to and across California.   The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.   Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

135.   The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health and wellbeing of Plaintiffs and the Subclass Members as well as to the environment.

136.   Defendant continues to misrepresent to consumers that the Products was safe and sustainable.   However, as described, this is not the case.

137.   In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.   Plaintiffs and other Class Members based their purchasing decisions on Defendant's omitted material facts.   The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to tens of millions of dollars.   Plaintiffs and Class Members were injured in fact and lost money and property as a result.

138.   The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

139.  As a result of Defendant's wrongful conduct, Plaintiffs and Class Members lost money in an amount to be proven at trial.  Plaintiffs and Class Members are therefore entitled to restitution as appropriate for this cause of action.

140.  Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V
### (Fraud)

141.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

142.  Plaintiffs bring this claim individually and on behalf of the Class.

143.  At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as healthy, safe and sustainable.

144.  Defendant affirmatively misrepresented the Products, giving the Product the appearance of a product that is indeed safe for use.

145.  Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

146.  Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

147.  Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

148.   Plaintiffs and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

149.   Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VI
### (Constructive Fraud)

150.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

151.   Plaintiffs bring this claim individually and on behalf of the Class.

152.   At the time Plaintiffs and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

153.   Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed safe for consumption and otherwise sustainable.

154.   Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

155.   Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiffs and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiffs and Class Members, who relied on Defendant's representations and

omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

156. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

157. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

158. Plaintiffs and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

159. Defendant breached its duty to Plaintiffs and Class Members to make full disclosures of the safety of their Product.

160. Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Inducement)

161. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

162. Plaintiffs bring this claim individually and on behalf of the Class.

163. Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

164. Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

165. Defendant also knew that its omissions and misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

166. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

167. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

168. Plaintiffs and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product.

169. Defendant intended to induce—and did, indeed, induce—Plaintiffs and Class Members into purchasing the Products based upon its affirmative representations and omissions.

170. Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

**COUNT VIII**
**(Money Had and Received)**

171. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

172. Plaintiffs bring this claim individually and on behalf of the Class.

173. As a result of the Plaintiffs' and Class Members' purchase of the Products, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing

1  implied in those agreements, became indebted to the Plaintiffs and Class Members in

2  an amount to be determined at trial.

3      174.   No part of any of the monies due and owing to Plaintiffs and Class

4  Members has been repaid, although Plaintiffs and Class Members demand

5  repayment, leaving the balance due, owing, and unpaid in an amount to be

6  determined at trial plus interest.

## COUNT IX
### (Fraudulent Concealment or Omission)

7
8      175.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged

9  above.

10     176.   Plaintiffs bring this claim individually and on behalf of the Class.

11     177.   At all relevant times, Defendant was engaged in the business of

12  designing, manufacturing, distributing, and selling the Products.

13
14     178.   Defendant, acting through its representatives or agents, delivered the

15  Product to its own distributors and various other distribution channels.

16     179.   Defendant willfully, falsely, and knowingly omitted various material

17  facts regarding the quality and character of the Products as discussed throughout.

18     180.   Rather than inform consumers of the truth regarding the Products,

19  Defendant misrepresented the quality of the Products as discussed herein at the time

20  of purchase.

21     181.   Defendant made these material misrepresentations to boost or maintain

22  sales of the Products, and to falsely assure purchasers of the Products that Defendant

23  is a reputable company and that its Products are healthy, safe for use, and otherwise

24  sustainable.   The false representations were material to consumers because the

25  representations played a significant role in the value of the Products purchased.

26     182.   Plaintiffs and Class Members accepted the terms of use, which were

27  silent on the true nature of the Products, as discussed throughout.   Plaintiffs and

28  Class Members had no way of knowing that Defendant's misrepresentations as to the

1  Products, and had no way of knowing that Defendant's misrepresentations were
2  misleading.

3         183.  Although Defendant had a duty to ensure the accuracy of the
4  information regarding the Products, it did not fulfill these duties.

5         184.  Defendant misrepresented material facts partly to pad and protect its
6  profits, as it saw that profits and sales of the Products were essential for its continued
7  growth and to maintain and grow its reputation as a premier designer and vendor of
8  the Products.  Such benefits came at the expense of Plaintiffs and Class Members.

9         185.  Plaintiffs and Class Members were unaware of these material
10 misrepresentations, and they would not have acted as they did had they known the
11 truth.   Plaintiffs' and class members' actions were justified given Defendant's
12 misrepresentations.  Defendant was in the exclusive control of material facts, and
13 such facts were not known to the public.

14        186.  Due to Defendant's misrepresentations, Plaintiffs and Class Members
15 sustained injury due to the purchase of the Products that did not live up to their
16 advertised representations.  Plaintiffs and Class Members are entitled to recover full
17 refunds for the Products they purchased due to Defendant's misrepresentations.

18        187.  Defendant's acts were done maliciously, oppressively, deliberately, and
19 with intent to defraud, and in reckless disregard of Plaintiffs, and Class Members'
20 rights and well-being, and in part to enrich itself at the expense of consumers.
21 Defendant's acts were done to gain commercial advantage over competitors, and to
22 drive consumers away from consideration of competing products. Defendant's
23 conduct warrants an assessment of punitive damages in an amount sufficient to deter
24 such conduct in the future.

## COUNT X
### (Fraudulent Misrepresentation)

25
26        188.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged
27 above.
28

189.   Plaintiffs bring this claim individually and on behalf of the Class.

190.   Defendant falsely represented to Plaintiffs and the Class that the Products were health, safe for use and otherwise sustainable.

191.   Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

192.   Defendant knew or should have known that its representations about the Products were false in that the Products are not healthy, not safe for consumption, and not sustainable as discussed throughout.   Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

193.   Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment.   Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiffs' and the Class' reliance on Defendant's misrepresentations was justifiable.

194.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Products and that they do not conform to Defendant's advertising and marketing.

195.   Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT XI
### (Negligent Misrepresentation)

196.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

197.   Plaintiffs bring this claim individually and on behalf of the Class.

198.   Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

199.  Defendant breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

200.  Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Product was not safe for use and not sustainable.

201.  As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not safe for consumption and that the Products do not conform to the Product's labeling, packaging, advertising, and statements.

202.  Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

<u>COUNT XII</u>
**(Quasi-Contract / Unjust Enrichment)**

203.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

204.  Plaintiffs bring this claim individually and on behalf of the Class.

205.  To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

206.  Plaintiffs and Class Members conferred benefits on Defendant by purchasing the Products.

207.  Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members' purchases of the Product.  Retention of those moneys

under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product was unfit for its intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Product if the true facts were known.

208.   Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XIII
### (Breach of Express Warranty)

209.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

210.   Plaintiffs bring this claim individually and on behalf of the Class.

211.   Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Product.

212.   The terms of the contract include the promises and affirmations of fact made by Defendant on the Products packaging and through marketing and advertising, as described above.

213.   This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

214.   As set forth above, Defendant purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is otherwise sustainable.

215.   Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

216.   Defendant breached express warranties about the Products and its qualities because despite Defendant's warranties that the Products are safe for consumption and is otherwise sustainable the Product is objectively not in fact safe

for use and not sustainable.   Thus, the Product did not confirm to Defendant's affirmations and promises described above.

217.   Plaintiffs and each Class Member would not have purchased the Product had they known the true nature of the Products.

218.   On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter, apprising Defendant of its breach of warranties.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Because of the gravity of the harm alleged, Plaintiffs has chosen not to wait for Defendant's response.  Plaintiff has also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein.   Accordingly, Plaintiff's letter would not have served the purpose of the letter.

219.   As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## COUNT XIV
### (Negligent Failure to Warn)

220.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

221.   Plaintiffs bring this claim individually and on behalf of the Class.

222.   At all relevant times, Defendant were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and its packaging.  At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in its intended

manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

223.   At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiffs and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

224.   Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiffs and the Class of all dangers associated with the intended use of the Products.

225.   At minimum, the duty arose for Defendant to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

226.   Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Products, including Plaintiffs and the Class, regarding the true nature of the Products, their risks, and potential dangers.

227.   Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contains ingredients known to cause adverse health effects in humans.

228.   Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Products as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks.  Defendant failed to exercise reasonable care in providing Plaintiffs and the Class with adequate warnings.

229.   As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Products, including its intended use, could cause and has caused injuries and other damages, Plaintiffs and the Class have suffered

1  damages, as described herein.  Plaintiffs also requests medical monitoring as a means

2  to safeguard their health and mitigate any damages for future medical treatment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

     (a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Class and the California Subclass and Plaintiffs' attorneys as Class Counsel;

     (b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

     (c)    For an order finding in favor of Plaintiffs, the Class, and the California Subclass on all counts asserted herein;

     (d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

     (e)    For prejudgment interest on all amounts awarded;

     (f)    For an order of restitution and all other forms of equitable monetary relief;

     (g)    For injunctive relief as pleaded or as the Court may deem proper;

     (h)    For medical monitoring as a means to safeguard Plaintiffs' and Class Members' health and to mitigate any damages for future medical treatment; and

     (i)    For an order awarding Plaintiffs and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

1    Dated: April 27, 2022                    Respectfully submitted,

2                                             **BURSOR & FISHER, P.A.**

3
                                             By:    */s/ L. Timothy Fisher*
4

5                                             L. Timothy Fisher (State Bar No. 191626)
                                             Sean L. Litteral (State Bar No. 331985)
6                                             1990 North California Boulevard, Suite 940
                                             Walnut Creek, CA  94596
7                                             Telephone: (925) 300-4455
                                             Facsimile:  (925) 407-2700
8                                             Email: ltfisher@bursor.com
9                                                    slitteral@bursor.com

10
                                             **BURSOR & FISHER, P.A.**
11                                            Joshua D. Arisohn (*pro hac vice* forthcoming)
                                             Alec M. Leslie (*pro hac vice* forthcoming)
12                                            888 Seventh Avenue
                                             New York, NY 10019
13                                            Telephone: (646) 837-7150
                                             Facsimile:  (212) 989-9163
14                                            E-Mail: jarisohn@bursor.com
15                                                    aleslie@bursor.com

16
                                             *Attorneys for Plaintiff and the Putative Class*
17

18

19

20

21

22

23

24

25

26

27

28

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Neil Hamman who resides in Ramona, California, and for Michael Stewart who resides in San Diego, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California.   Additionally, Defendant transacts substantial business in this District, including purchases of the Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiff in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 27th day of April, 2022.


_____/s/ L. Timothy Fisher_____
L. Timothy Fisher