1   MILES D. SCULLY  (SBN:  135853)
    mscully@grsm.com
2   JUSTIN D. LEWIS  (SBN:  239686)
    jlewis@grsm.com
3   GORDON REES SCULLY MANSUKHANI, LLP
    101 W. Broadway, Suite 2000
4   San Diego, CA 92101
    Telephone:  (619) 696-6700
5   Facsimile:  (619) 696-7124

6   Attorneys for defendant
    CAVA GROUP, INC.

7

8              UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  NEIL HAMMAN and MICHAEL          )  NO. 3:22-c-00593-MMA-MSB
    STEWART, on behalf of themselves )
12  and all others similarly situated, )
                                     )
13                    Plaintiffs,    )  **MEMORANDUM OF POINTS**
                                     )  **AND AUTHORITIES IN**
14        vs.                        )  **SUPPORT OF MOTION TO**
                                     )  **DISMISS FIRST AMENDED**
15  CAVA GROUP, INC.,                )  **COMPLAINT**
                                     )
16                    Defendant.     )  Judge:  Hon. Michael M. Anello
                                     )  No Hearing Per Chambers Rules
17                                   )
                                     )
18  _____ )

19

20

21

22

23

24

25

26

27

28

_____
            **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
                **MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   BACKGROUND ............................................................................. 2

III.  THE AMENDED COMPLAINT REQUIRES DISMISSAL. ........................ 7

    A.    Plaintiffs Lack Article III Standing For Monetary Or Any
         Retrospective Relief. ............................................................ 7

         1.    Plaintiffs Do Not Allege Their Purchases Contained
              PFAS Or Biocides. .................................................... 8

         2.    Only Some PFAS May Be Risky, Not All. ........................... 10

         3.    Plaintiffs Do Not Allege Receiving PFAS Or Biocides In
              Harmful Amounts. ................................................... 10

         4.    Plaintiffs Allege Mere Speculation Of Some Future
              Disease. ............................................................... 12

    B.    Plaintiffs Also Lack Standing To Seek Prospective Relief. ............... 15

    C.    The Liability Theory Lacks A Plausible Foundation. ...................... 15

         1.    Plaintiffs' Expectations Lack A Plausible Basis. ................... 16

         2.    Plaintiffs' Own Allegations Further Render Their PFAS
              Expectations Implausible. .......................................... 19

    D.    Plaintiffs' Claims Remain Unpled Under Rules 8 Or 9. .................. 21

    E.    Plaintiffs Have No Claim For Omission-Based Liability. ................. 24

IV.   CONCLUSION ............................................................................. 25

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akridge v. Whole Foods Mkt. Grp., Inc.*,
No. 20 Civ. 10900 (ER), 2022 WL 955945 (S.D.N.Y. Mar. 30, 2022) ............... 8

*Andrews v. Procter & Gamble Co.*,
No. EDCV-19-00075 AG(SHKx),
2019 WL 6520045 (C.D. Cal. June 3, 2019) ...................................................... 9, 21

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ............................................................................. 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................. 22

*Axon v. Citrus World, Inc.*,
354 F. Supp. 3d 170 (E.D.N.Y. 2018),
*affirmed*, 813 Fed. Appx. 701 (2d Cir. 2020) .................................................... 19

*Boysen v. Walgreen Co.*,
No. C 11-06262 SI, 2012 WL 2953069 (N.D. Cal. July 19, 2012) .................... 11

*Branch v. Tunnell*,
14 F.3d 449 (9th Cir. 1994) ................................................................................... 4

*Brown v. Madison Reed, Inc.*,
2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) .................................................... 23

*Clapper v. Amnesty Intl. USA*,
568 U.S. 398 (2013) ....................................................................................... 12, 14

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ............................................................................... 4

*Doss v. Gen. Mills, Inc.*,
No. 18-61924-Civ-Scola, 2019 WL 7946028 (S.D. Fla. June 14, 2019),
*affirmed at* 816 Fed. Appx. 312 ............................................................... 9, 12, 13

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) .......................................................................... 16, 24

*Farren v. Select Portfolio Servicing, Inc.*,
No. 2:16-cv-01077-JAM-DB, 2017 WL 1063891 (E.D. Cal. Mar. 20, 2017) .... 25

*Gaminde v. Long Pharma Nutrition, Inc.*,
No. 1:18-cv-300 (GLS/DEP), 2019 WL 1338724 (N.D.N.Y. Mar. 25, 2019) ...... 9

*Gutierrez v. Johnson & Johnson Consumer, Inc.*,
2021 WL 822721 (S.D. Cal. Jan. 22, 2021) ........................................................ 23

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-ii-

*Ham v. Hain Celestial Grp., Inc.*,
  70 F. Supp. 3d 1188 (N.D. Cal. 2014) ................................................. 16

*Herrington v. Johnson & Johnson Consumer Cos.*,
  No. C 09-1597 CW, 2010 WL 3448531 (N.D. Cal. Sep. 1, 2010) ............... 11, 13

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ................................................. 24

*Hughes v. Chattem, Inc.*,
  818 F. Supp. 1112 (S.D. Ind. 2011) ......................................... 13

*In Re Amla Litig.*,
  320 F. Supp. 3d 578 (S.D.N.Y. 2018) ....................................... 12

*In re Apple Inc. Device Performance Litig.*,
  347 F. Supp. 3d 434 (N.D. Cal. 2018) ...................................... 21

*In Re Fruit Juice Prods. Mktg. & Sales Practices Litig.*,
  831 F. Supp. 2d 507 (D. Mass. 2011) ...................................... 7, 11, 14

*In Re Gen. Mills Glyphosate Litig.*,
  No. 16-2869 (MJD/BRT), 2017 WL 2983877 (D. Minn. July 12, 2017) ......... 19

*In Re Hydroxycut Mktg. & Sales Pracs. Litig.*,
  2011 WL 1002190 (S.D. Cal. Mar. 21, 2011) ................................ 23

*In Re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Practices & Liab. Litig.*,
  903 F.3d 278 (3rd Cir. 2018) ............................................... 7, 8

*In Re Metformin Mktg. & Sales Pracs. Litig.*,
  No. 20-2324, 2022 WL 970281 (D.N.J. Mar. 30, 2022) ...................... 9

*Interstate Nat. Gas Co. v. S. Cal. Gas Co.*,
  209 F.2d 380 (9th Cir. 1953) ............................................... 4

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ............................................. 22

*Kimca v. Sprouts Foods, Inc.*,
  No. 21-12977 (SRC), 2022 WL 1213488 (D.N.J. Apr. 25, 2022) ............. 11

*Koronthaly v. L'Oréal USA, Inc.*,
  No. 07-CV-5588 (DMC), 2008 WL 2938045 (D.N.J. July 29, 2008),
  *affirmed at* 374 Fed. Appx. 257 (3d Cir. 2010) ......................... 13, 14

*Lee v. Am. Nat'l Ins.*,
  260 F.3d 997 (9th Cir. 2001) .............................................. 8

*Loomis v. Slendertone Distrib., Inc.*,
  420 F. Supp. 3d 1046 (S.D. Cal. 2019) .................................... 16, 17

*Low v. LinkedIn Corporation*,
  900 F. Supp. 2d 1010 (N.D. Cal. 2012) .................................... 25

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-iii-
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ......................................................................... 8

*Manzarek v. St. Paul Fire & Marine Ins.,*
  519 F.3d 1025 (9th Cir. 2008) ......................................................... 4

*Marshall v. Gen. Motors/Corp. Serv. Co.,*
  2019 WL 2642661 (S.D. Cal. June 27, 2019) ................................ 23

*McCrary v. Elations Co., LLC,*
  2013 WL 6402217 (C.D. Cal. Apr. 24, 2013) ................................ 21

*Meaunrit v. Pinnacle Foods Grp., LLC,*
  No. C 09-04555 CW, 2010 WL 1838715 (N.D. Cal. May 5, 2010) ............. 8, 13

*Moore v. Mars Petcare US, Inc.,*
  966 F.3d 1007 (9th Cir. 2020) ....................................................... 16

*Moore v. Trader Joe's Co.,*
  4 F. 4th 874 (9th Cir. 2021) .......................................................... 16

*Moreno v. Vi-Jon, LLC,*
  No. 20-cv-1446 JM (BGS), 2021 WL 5771229 (S.D. Cal. Dec. 6, 2021) .......... 19

*Parks v. Ainsworth Pet Nutrition, LLC,*
  No. 18-cv-6936 (LLS), 2020 WL 832863 (S.D.N.Y. Feb. 20, 2020) .......... 19

*Renfro v. Champion Petfoods USA, Inc.,*
  25 F.4th 1293 (10th Cir. 2022) .................................................. 8, 18

*Rice v. Sunbeam Prods., Inc.,*
  No. CV 12-7923-CAS-(AJWx), 2013 WL 146270 (C.D. Cal. Jan. 7, 2013) ...... 19

*Rugg v. Johnson & Johnson,*
  No. 17-cv-05010-BLF, 2018 WL 3023493 (N.D. Cal. June 18, 2018) .......... 18

*Schloegel v. Edgewell Personal Care Co.,*
  No. 4:21-cv-000631-DGK, 2022 WL 808694 (W.D. Mo. Mar. 16, 2022) .......... 9

*Song v. Champion Petfoods USA, Inc.,*
  27 F.4th 1339 (8th Cir. 2022) ...................................................... 18

*Souter v. Edgewell Personal Care Co.,*
  542 F. Supp. 3d 1083 (S.D. Cal. 2021) ............................... 16, 17, 18

*Stewart v. Electrolux Home Prods.,*
  No. 1:17-cv-01213-LJO-SKO,
  2018 WL 1784273 (E.D. Cal. Apr. 13, 2018) ............................... 24

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .............................................................. 12, 15

*Swartz v. KPMG LLP,*
  476 F.3d 756 (9th Cir. 2007) ....................................................... 22

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-iv-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

*TransUnion LLC v. Ramirez*,
__ U.S. __, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) ..........................................8

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003)..................................................................21, 22

*Wallace v. ConAgra Foods, Inc.*,
747 F.3d 1025 (8th Cir. 2014).........................................................................9

*Wilson v. Hewlett-Packard Co.*,
668 F.3d 1136 (9th Cir. 2012)........................................................................24

*Yu v. Dr. Pepper Snapple Grp., Inc.*,
No. 18-cv-6664 (BLF), 2020 WL 5910071 (N.D. Cal. Oct. 6, 2020) .................18

**Rules**

Federal Rules of Civil Procedure
Rule 11 .........................................................................................................10

Federal Rules of Civil Procedure
Rule 12 ...................................................................................................4, 15

Federal Rules of Civil Procedure
Rule 8 .........................................................................................................21

Federal Rules of Civil Procedure
Rule 9 .........................................................................................2, 21, 22, 23

**Regulations**

40 Code of Federal Regulations
Section 180.342.............................................................................................3

40 Code of Federal Regulations
Section 180.364.............................................................................................3

40 Code of Federal Regulations
Section 180.474.............................................................................................3

40 Code of Federal Regulations
Section 180.578.............................................................................................3

40 Code of Federal Regulations
Section 180.678.............................................................................................3

40 Code of Federal Regulations
Section 180.721.............................................................................................3

**Other Authorities**

Helen Schofield, *Fluorine Chemistry Statistics: Numbers of Organofluorine Compounds and Publications Associated with Fluorine Chemistry*, 100 J. Fluorine Chemistry 7, 8 (1999)..................................................................5

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

# I.      INTRODUCTION

Struggling to plead a theory against defendant CAVA Group, Inc. in this putative class action, Plaintiffs elected to amend rather than face CAVA's motion to dismiss their original complaint.  Now they are back with a first amended complaint ("FAC") that similarly requires dismissal for multiple reasons, starting with lack of standing.

Plaintiffs have no injury, just speculation.  They say they paid for meals in packaging they believed would not possibly contain a trace of any potentially pathogenic form of PFAS.  Yet, nowhere do Plaintiffs allege that their purchases actually contained any identifiable form of PFAS whatsoever, much less a potentially risky form that migrated into their food at levels likely to cause future disease.  The supposed injury is a chain of conjecture and hypothesis, not the actual, concrete, and particularized injury-in-fact that Article III demands.  They say CAVA must pay refunds because the units of packaging from which they ate *might or might not* have contained PFAS of a form that *might or might not* have pathogenic qualities, that it *might or might not* have seeped into their food, and it *might or might not* have been present in amounts that *might or might not* actually cause Plaintiffs or anybody else to develop future disease.

As a hedge against the PFAS theory's defects, the amended complaint also ventures a new theory that some CAVA foods might have contained faint traces of six pesticides, fungicides, or insecticides.  This new "biocide" theory falters on grounds similar to the PFAS theory.  It, too, is speculation.  Plaintiffs do not allege that their own meals contained any of the disputed biocides at levels likely to cause them any future disease.  They ask the Court to suppose a merely potential injury.

Looking past these fatal standing defects, the liability theory animating each cause of action lacks a plausible basis in the objective expectations of the reasonable consumer.  Plaintiffs somehow expected products with no chance of containing any detectable traces of PFAS or biocides, but the FAC pleads no

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

1 plausible basis for Plaintiffs to hold such expectations.  CAVA made no
2 representation about any of the disputed biocides.  As for PFAS, the FAC
3 overtaxes the CAVA website's aspiration to eliminate PFAS from packaging, a
4 statement that Plaintiffs do not allege relying upon or seeing in the first place.
5 Instead, the FAC itself illustrates why Plaintiffs could not plausibly expect the
6 products to be utterly free of any trace of PFAS or biocide, given their elaborate
7 allegations conceding that PFAS exist practically everywhere that raw materials
8 for consumer goods come from, and the common knowledge of biocides'
9 widespread use in agriculture.

10      Even if they were plausible, Plaintiffs' theories remain simply unpled.
11 Though attempting to frame a chemical theory of fraud, they have not alleged what
12 offending chemicals their own purchases contained.  As such, the "circumstances
13 constituting fraud" against each Plaintiff remain a guesswork.  FED. R. CIV. PROC.
14 9(b).  Plaintiffs' allegations of reliance and scienter remain hazy or even
15 conclusory, and their omission-based claims lack plausible allegations to invoke a
16 supposed duty to disclose that does not exist.  This is a lawsuit searching for cause.

17      In all, Plaintiffs have tried and failed again to plead a justiciable controversy
18 or plausible claims.  The Court should dismiss this case with prejudice as more
19 fully detailed below.

## II.    BACKGROUND

21      CAVA operates Mediterranean "fast casual" restaurants where, among other
22 product offerings, patrons can build customized grains and greens bowls from a
23 wide variety of foods.  They generally consume the bowls shortly thereafter.

24      Plaintiffs claim some CAVA foods, but not their own meals, tested to
25 contain "biocides" in "trace amounts."  *See* FAC, ¶¶ 104-112, 104 n. 55.  The
26 biocides at issue (isoprothiolane, tricyclazole, tebuconazole, chlorpyrifos,
27 glyphosate, and acetamiprid) are EPA-regulated pesticides, fungicides, or
28 insecticides.  The EPA set a "tolerance level" to define, scientifically and legally,

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  how much residue of each chemical on food is safe for human consumption.  *See*

2  40 C.F.R. § 180.721 (isoprothiolane); 40 C.F.R. § 180.678 (tricyclazole); 40

3  C.F.R. § 180.474 (tebuconazole); 40 C.F.R. § 180.342 (chlorpyrifos; expired); 40

4  C.F.R. § 180.578 (acetamiprid); 40 C.F.R. § 180.364 (glyphosate).  Notably, the

5  EPA's safe tolerance levels are measured in parts per million.  Plaintiffs claim their

6  lab found faint traces of biocides in the range of parts per *billion*.  FAC, ¶ 104.

7  One part per billion is a thousand-times weaker concentration than one part per

8  million.   Plus, Plaintiffs' own source admits the tolerances are set at "one one-

9  hundredth of the amount of a pesticide that doesn't cause apparent harm to animals

10  in laboratory testing."  Ex. 11 at 8.[1]  That adds another order of magnitude of

11  disconnect between any potential biocide risk and the FAC's speculative theory.

12  Separately, per- and polyfluoroalkyl substances ("PFAS") are an extremely

13  broad chemical category consisting of "thousands" of "diverse" compounds used

14  frequently in industrial applications and consumer products.  FAC, ¶¶ 2, 77; Ex. 1

15  at 3-4; Ex. 2 at 3; Ex. 3 at 2.  Only about 30 PFAS compounds are individually

16  identifiable through regularly available testing.  *See* Ex. 1 at 6; Ex. 4 at 5.  For

17  decades the FDA has authorized several PFAS compounds for use in food contact

18  applications.  *See* Ex. 3 at 3.  In contrast, only two members of the numerous PFAS

19  grouping, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate

20  ("PFOS"), have been the main focus of EPA proposed rulemaking as potential

21  hazardous substances.  *See* Ex. 4 at 2; Figure 1, *infra*.  Scientific research regarding

22  PFAS is nascent despite Plaintiffs' sweeping, demonstrably untrue

23  pronouncements that all 12,000+ members of the PFAS category of chemicals are

24  known to cause harmful health effects.  *See, e.g.,* FAC, ¶ 2 (alleging that PFAS

25  "are a class…that have a negative impact on human health," but citing a National

26  Institute of Health webpage explaining that "[m]ore research is needed to fully

27  understand…*if* and *how* they *may* cause health problems") (emphasis added); Ex.

28
[1] Exhibit pinpoint citations refer to ECF-stamped page numbers.

-3-
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

10 at 2; Ex. 5 at 2 (EPA lists 12,304 forms of PFAS).

Indeed, limited research to date on the potential health effects of PFAS is inconclusive and equivocal, with risk depending on the particular PFAS at issue and the conditions of exposure. No less than the EPA makes clear that "[s]cientific studies have shown that exposure to *some* PFAS in the environment *may* be linked to harmful health effects in humans," but the existence of "thousands of PFAS chemicals…makes it challenging to study and assess the *potential* human health and environmental risks." Ex. 2 at 3 (emphasis added).[2] Accordingly, the EPA advises that while "research is still ongoing," any "health effects associated with exposure to PFAS are difficult to specify for many reasons," including that "[t]here are *thousands of PFAS with potentially varying effects and toxicity levels*," "most studies focus on a *limited number* of better known PFAS compounds," "[p]eople can be exposed to PFAS in different ways and at different stages of their life," and "[t]he types and uses of PFAS change over time, which make it challenging to track and assess how exposure to these chemicals occurs and how they will affect human health." Ex. 4 at 4-5 (emphasis added).

The scientific studies and regulatory authorities that Plaintiffs cite throughout the FAC acknowledge these realities. Contradicting their erroneous blanket assertion that *all* PFAS are *known* to be harmful, Plaintiffs' sources merely posit that a select subset of chemicals within the extremely broad and diverse

---

[2] On a Rule 12 motion, the Court "may consider materials incorporated into the complaint," *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010), materials that are "properly judicially noticeable," and materials "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). The Court need not accept as true "facts" alleged in the FAC "which are revealed to be unfounded by documents included in the pleadings or introduced in support of the motion." *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 384 (9th Cir. 1953); *see also Manzarek v. St. Paul Fire & Marine Ins.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (Courts "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint.").

PFAS category may, in some circumstances, carry potential concern. *See*, *e.g.*, Ex. 1 at 10 (noting FDA's preference for regulating PFAS on an individual basis because "concerns about one specific PFAS might *not* be 'indicative of concerns for *all* chemicals classified as PFAS'") (emphasis added); Ex. 2 at 3 ("[s]cientific studies have shown that exposure to *some* PFAS in the environment *may* be linked to harmful health effects in humans") (emphasis added); Ex. 6 at 3 ("Exposure to certain PFAS has been linked" to "health effects"); Ex. 7 at 4 ("the PFAS class comprises distinct substances with very different structures and properties," "some bioaccumulate while others do not," and "[s]ome PFAS are considered of low health concern"). Of course, since Plaintiffs nowhere allege what form(s) of PFAS CAVA's packaging supposedly contains, neither do they allege it contains a single molecule of any of the possibly risky forms of PFAS named by the FAC's sources.

One non-specific method for testing the *potential* presence of a member of the PFAS chemical grouping is to measure a product's total organic fluorine content, as PFAS is but one of multiple possible sources of organic fluorine.[3]  In the FAC, Plaintiffs dig their heels into their reliance on this type of proxy test to construct a hypothesis about the possible presence of unidentified PFAS in CAVA's grains or greens bowls. *See e.g.*, FAC, ¶¶ 6-8, 11-13.  But, as the FAC has no choice but to concede, there are "other sources" of organic fluorine that are *not* PFAS, meaning that the presence of organic fluorine in a product does not mean the presence of PFAS.  FAC, ¶ 62; Ex. 1 at 6.  Plaintiffs' own sources explicitly acknowledge that total organic fluorine testing measures the presence of

---

[3] Fluorine is one of Earth's basic and most abundant chemical elements, which in its elemental form is a gas that combines with many other elements to form an immeasurably broad class of so-called "fluorinated" chemicals.  Organic fluorine compounds, in turn, are chemicals in which fluorine and carbon have combined. To underscore the sheer number of organic fluorine chemicals that exist, some 610,873 *new* organic fluorine compounds were registered by a single organization in the single decade of 1989 to 1998.  *See* Helen Schofield, *Fluorine Chemistry Statistics: Numbers of Organofluorine Compounds and Publications Associated with Fluorine Chemistry*, 100 J. Fluorine Chemistry 7, 8 (1999).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

organic fluorine merely as an over-inclusive proxy for the possible presence of PFAS and certainly does not signal the presence of any particular form of PFAS of a potentially toxic character. *See* FAC, ¶ 62; Ex. 1 at 6; Ex. 6 at 9.

Plaintiffs, on notice of the defects in their original complaint by virtue of CAVA's initial motion to dismiss, filed a FAC that doubles down on the original complaint's reliance on total organic fluorine testing. Plaintiffs allege that the products are falsely advertised because their post-litigation tests detected that CAVA bowls contain organic fluorine compounds. They again claim that the presence of organic fluorine establishes that the bowls <u>may</u> contain PFAS. *See* FAC, ¶ 18 (alleging that "the Products are unsafe, unhealthy, or harmful to the environment [and] contain[] heightened levels of fluorine *indicating* the presence of PFAS") (emphasis added). But as Figure 1 illustrates, organic fluorine is a diverse and numerous class of compounds, which in turn includes the group of chemicals known as PFAS, which in turn include certain species of PFAS that are approved by the FDA for food contact (Ex. 3 at 3), certain that are potentially harmful to humans, and others that are otherwise not a focus of regulatory concern.



**Organic fluorine compounds** (compounds with a carbon-fluorine bond) [1]

**Per– and polyfluoroalkyl substances (PFAS),** at least 12,034 in number [2]

**PFAS subject to proposed federal regulation as hazardous substances** (PFOA and PFOS) [3]

*Figure 1.*

[1] 610,873 new compounds with a carbon-fluorine bond were registered between 1989 and 1998 *alone*.

[2] EPA's database counts at least 12,034 forms of PFAS.

[3] EPA has proposed to designate only 2 forms of PFAS as hazardous.

The FAC remains most notable for what it does not plead. It does not allege that the products Plaintiffs purchased actually contained PFAS. It does not allege

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-6-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

that any (conjectural) PFAS actually migrated from packaging into the grains or greens that Plaintiffs ate.  While Plaintiffs now claim to have tested CAVA foods, conspicuously absent from the FAC is any allegation that the food they tested actually contained any PFAS at all.  The FAC still does not allege that the Plaintiffs' consumption of CAVA grains or greens bowls caused a single instance or even indicium of physical harm, or was not flavorful, filling, and nutritious.

## III.    THE AMENDED COMPLAINT REQUIRES DISMISSAL.

### A.    Plaintiffs Lack Article III Standing For Monetary Or Any Retrospective Relief.

Plaintiffs lack standing to seek monetary or other retrospective relief because they do not plausibly allege a concrete and particularized injury-in-fact. Though the FAC wholly depends on allegations that some forms of PFAS or biocides might be linked to various diseases, Plaintiffs do not claim that CAVA's products caused them (or anyone else) a physical injury.  *In Re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Practices & Liab. Litig*., 903 F.3d 278, 289-290 (3d Cir. 2018) ("Although [plaintiff] contends that Baby Powder is 'unsafe,' her own allegations require us to conclude that the powder she received was, in fact, *safe as to her*" since she "did not allege that she developed ovarian cancer, nor did she allege she is at risk of developing ovarian cancer").  Nor do Plaintiffs complain that CAVA's products failed to nourish them.  Despite their subjective buyers' remorse, they have no economic injury because they got exactly what they claim they bargained for:  delicious meals that nourished them without causing any physical injury.  *In Re Fruit Juice Prods. Mktg. & Sales Practices Litig*., 831 F. Supp. 2d 507, 510-511 (D. Mass. 2011) ("The fact is that Plaintiffs paid for fruit juice, and they received fruit juice, which they consumed without suffering harm," despite alleged lead contamination).  The Court could stop there.

However, if the Court is willing to look past those realities, it would then find that Plaintiffs' own telling of their supposed injury rests on multiple layers of

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

speculation, each exiling the FAC from Article III. *TransUnion LLC v. Ramirez*, __ U.S. __, 141 S.Ct. 2190, 2210, 210 L.Ed.2d 568 (2021) (class members whose credit files were not actually disseminated to third-parties did not suffer Article III "concrete harm"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) ("the party seeking review be himself among the injured"); *Lee v. Am. Nat'l Ins.*, 260 F.3d 997, 1001–02 (9th Cir. 2001) (consumer lacked Article III standing where he failed to show "that he ha[d] actually been injured by the defendant's challenged conduct"); *Johnson & Johnson*, 903 F.3d at 289-290 ("references to Baby Powder being unsafe *as to others* are not relevant to determining whether [plaintiff] has standing *herself*" to assert economic injury).

## 1. Plaintiffs Do Not Allege Their Purchases Contained PFAS Or Biocides.

First, the FAC does not allege that the packaging of Plaintiffs' own meals, let alone the food they consumed, contained a single molecule of any form of PFAS or biocide. *See* FAC (no such allegations). Unless they did, then Plaintiffs received what they allegedly bargained for in exchange for their purchase prices. *E.g.*, *Meaunrit v. Pinnacle Foods Grp., LLC*, No. C 09-04555 CW, 2010 WL 1838715, at *2-3 (N.D. Cal. May 5, 2010) (no standing to assert a "speculative, hypothetical" theory of "economic injury" alleging that pot pies only "might contain harmful pathogens"); *Akridge v. Whole Foods Mkt. Grp., Inc*., No. 20 Civ. 10900 (ER), 2022 WL 955945, at *6-*7 (S.D.N.Y. Mar. 30, 2022) (no standing to assert economic injury where plaintiff did not allege "that he actually purchased products containing unidentified allergens," meaning he "ask[s] the Court to infer an injury for him"); *Renfro v. Champion Petfoods USA, Inc*., 25 F.4th 1293, 1305 (10th Cir. 2022) (affirming dismissal where plaintiffs "failed to allege they purchased any contaminated dog food," but only "that they purchased dog food that was at risk of contamination," which was "insufficient for standing"); *In Re Metformin Mktg. & Sales Pracs. Litig.*, No. 20-2324, 2022 WL 970281, at *3

-8-

1   (D.N.J. Mar. 30, 2022) ("without any allegations that [plaintiffs] actually

2   purchased [drugs] that were contaminated with NDMA, they lack standing to bring

3   such a class action"); *Schloegel v. Edgewell Personal Care Co.*, No. 4:21-cv-

4   000631-DGK, 2022 WL 808694, at *2-3 (W.D. Mo. Mar. 16, 2022) ("Plaintiff has

5   failed to allege that she actually purchased [sunscreens] which were adulterated

6   with benzene, and thus has failed to allege that she did not receive exactly what

7   Edgewell promised:  an unadulterated sunscreen product").

8           To be sure, the testing allegations provide no basis to conclude that

9   Plaintiffs' purchases contained PFAS or biocide.  There is no indication that

10   Plaintiffs' laboratory even tested a representative sample of any article of

11   packaging or foodstuff, much less the meals or packaging that Plaintiffs actually

12   purchased.  For that matter, the testing did not even look for actual PFAS

13   compounds, but merely an over-inclusive proxy, fluorine, in an approach already

14   rejected by a California court.  *Andrews v. Procter & Gamble Co.*, No. EDCV-19-

15   00075 AG(SHKx), 2019 WL 6520045, at *3 (C.D. Cal. June 3, 2019) (fluorine

16   does not mean PFAS).  The additional authorities supporting dismissal become

17   cumulative.  *Gaminde v. Long Pharma Nutrition, Inc.*, No. 1:18-cv-300

18   (GLS/DEP), 2019 WL 1338724, at *2 (N.D.N.Y. Mar. 25, 2019) ("[I]t is

19   speculation to allege that because two CVS Krill Oil bottles in a USDA study were

20   found to have less than the stated amount of Omega-3 Krill Oil, the bottle that

21   [plaintiff] purchased must as well."); *Doss v. Gen. Mills, Inc.*, No. 18-61924-Civ-

22   Scola, 2019 WL 7946028, at *2 (S.D. Fla. June 14, 2019) *affirmed at* 816 Fed.

23   Appx. 312, 314 (dismissing consumer fraud, warranty, and unjust enrichment

24   claims where plaintiff did not allege that her own Cheerios contained glyphosate,

25   "just that some Cheerios that have been tested do"); *see also Wallace v. ConAgra

26   Foods, Inc.,* 747 F.3d 1025, 1030 (8th Cir. 2014) (no standing "[w]ithout any

27   particularized reason to think the consumers' own [hotdogs] actually exhibited the

28   alleged non-kosher defect").

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-9-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

1    Moreover, even if Plaintiffs had alleged that their packaging actually

2  contained a form of PFAS, they do not allege that it migrated into their food, or

3  any CAVA food, but only that PFAS are capable of such migration from

4  packaging to food.  In other words, they don't allege having found PFAS, or even

5  fluorine, in *any* sample of CAVA food, much less the meals they consumed.  The

6  lack of any such allegation is made more glaring considering Plaintiffs' allegations

7  that their counsel's lab *did* test food samples for traces of biocides.  FAC, ¶ 15.  If

8  they could have alleged that any CAVA food samples contained PFAS or fluorine

9  without running afoul of Rule 11, they would have.  They did not.

### 2.    Only Some PFAS May Be Risky, Not All.

11    Beyond Plaintiffs' failure to allege their own purchases contained *any* PFAS

12  whatsoever, they also do not allege *what PFAS substance(s)* their purchases

13  contained, let alone that they held traces of any of the PFAS that their FAC's

14  sources suggest may carry risk.  There is simply no basis in the FAC to conclude

15  that their purchases contained one of the forms of PFAS belonging to the subset

16  regarded as potentially risky.  Critically, PFAS is not a single chemical, but in

17  Plaintiffs' own account a "large group" of "thousands" of "divers[e]" substances

18  (FAC, ¶¶ 78, 77, 85), only some of which may have a pathogenic character.

19  Indeed, the EPA says only "some" "may be linked" to health effects, but the

20  potential risk is "challenging to study and assess" because there are "thousands of

21  PFAS chemicals…found in many different consumer, commercial, and industrial

22  products."  Ex. 2 at 3.  Despite this, the FAC does not plead what member(s) of the

23  voluminous PFAS category supposedly existed in the units of packaging material

24  that Plaintiffs received, making it impossible to surmise whether the packaging

25  they ate from contained a potentially risky form of PFAS versus a harmless one.

### 3.    Plaintiffs Do Not Allege Receiving PFAS Or Biocides In Harmful Amounts.

28    Next, let's assume Plaintiffs alleged that the packaging of their own meals

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-10-

1    actually contained an identifiable form of PFAS, or that they were served food

2    actually containing a residual trace of biocide.  Even then, they haven't alleged

3    personally receiving PFAS or biocides in *amounts* capable to risk, let alone cause,

4    injury or disease.  They do not even allege that *any* CAVA diner received PFAS or

5    biocides in such quantities.  *Fruit Juice*, 831 F. Supp. 2d at 510-511 (dismissing

6    for lack of standing where "Plaintiffs have made no allegations as to the amount of

7    lead actually in Defendants' [fruit juices], have not claimed that any particular

8    amount in the products is dangerous, and have not alleged that any specific amount

9    has caused actual injuries to any plaintiff").

10        Put another way, the FAC fails to allege what levels of which PFAS

11   compounds and which biocides in food or its packaging are necessary to the

12   development of disease, or that Plaintiffs' (or anyone's) purchases actually

13   exceeded those levels.  This is fatal to their claims.  *Boysen v. Walgreen Co*., No. C

14   11-06262 SI, 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012) (no economic

15   injury where fruit juice consumer pled "that arsenic and lead are harmful toxins,

16   and that the products contain those toxins," but not "that the levels of lead and

17   arsenic contained in defendant's juices are likely to cause physical harm," even

18   though, unlike here, he alleged "material and significant levels"); *Herrington v.*

19   *Johnson & Johnson Consumer Cos*., No. C 09-1597 CW, 2010 WL 3448531, at

20   *3, *4 (N.D. Cal. Sep. 1, 2010) (no economic injury where consumers of children's

21   bath products alleged only that supposed toxins "*may* be carcinogenic for humans,

22   that there *could* be no safe levels for exposure to carcinogens and that Defendants'

23   products contain some amount of these substances") (emphasis original); *Kimca v.*

24   *Sprouts Foods, Inc*., No. 21-12977 (SRC), 2022 WL 1213488, at *8 (D.N.J. Apr.

25   25, 2022) (though plaintiffs alleged that baby foods "contain heavy metals" and

26   "elevated levels…can be unsafe and dangerous," "they do not connect these two

27   allegations by establishing that the levels of heavy metals in the Baby Food

28   Products are unsafe").

-11-
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

Plaintiffs cannot avoid conceding that trivial exposures are legally meaningless. *In Re Amla Litig.*, 320 F. Supp. 3d 578, 585 (S.D.N.Y. 2018) (where consumers asserted economic injury in buying hair relaxer kit, "a loss of molecular structural integrity that the user does not even notice is not actionable"). The FAC acknowledges some "exposure levels" would be necessary to pose the health risks they supposedly bargained to avoid. FAC, ¶ 90; *id*. at ¶ 109, n. 60 ("toxicity level"). Even if those levels are "very low" (*id*. at ¶ 13), nowhere do Plaintiffs say that their purchases contained biocides or a risky form of PFAS at or above those levels. *Doss*, 2019 WL 7946028, at *2-3 ("no allegation that the cereal [plaintiff] purchased even contains glyphosate, never mind harmful levels of it," where plaintiff did "not define 'ultra-low levels' at which "glyphosate, in oats, cause[s] harm" or allege that her cereal exceeded that level).

### 4. Plaintiffs Allege Mere Speculation Of Some Future Disease.

Plaintiffs' theory of injury rests on still another shaky layer of speculation: the alleged links between some forms of PFAS, or biocides, and the risk of future health problems. Plaintiffs say the risk of a future physical injury is what makes their payments of purchase prices into present, existing injuries-in-fact. However, the threat of that future physical injury is itself "conjectural or hypothetical," not "actual and imminent," much less "certainly impending," as Article III requires for theories of future injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Clapper v. Amnesty Intl. USA*, 568 U.S. 398, 402, 407 (2013). Indeed, the Supreme Court has made clear that fear of "hypothetical future harm that is not certainly impending" "cannot manufacture standing" to pose past expenditures of money as present injuries-in-fact traceable to a defendant's conduct. *Id*.; *id*. at 418 ("subjective fear" of merely potential future surveillance "does not give rise to standing" based on costs already incurred to avoid surveillance).

The FAC alleges merely that unspecified forms of PFAS are "associated" or "linked" with various conditions. FAC, ¶¶ 13, 87, 89 ("associated" or

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

"associations"); *id*. at ¶¶ 14 ("scientists are studying" and "concerned"), 91 ("linked," "can"), 94 ("may"), 95 ("risk"). Likewise, the disputed biocides only might be capable of leading to future disease. *Id*. at ¶¶ 105 ("linked"), 106 ("potential"), 107 ("can"), 108 ("thought to pose a risk"), 109 ("linked"), 110 ("can lead"). The FAC gives no indication by how much -- or by how immaterially little -- exposure to any form of PFAS or the disputed biocides might increase a consumer's future chances of developing a disease. In the end, the most Plaintiffs venture is that CAVA's products bear a "potentially harmful nature." *Id*. at ¶ 136.

Yet, "[m]ere conjecture that something has the potential to be harmful is not enough." *Doss*, 2019 WL 7946028, at *3 (dismissal where plaintiff alleged only that "glyphosate *may* be harmful to human health' and that the World Health Organization classifies glyphosate as a '*probable* human carcinogen'") (emphases original) (internal citations omitted). The various hypothetical health risks underlying Plaintiffs' supposed injury theory are "far too speculative to manufacture standing in this case." *Id*.; *Herrington*, 2010 WL 3448531, at *3, *4 (similar dismissal where plaintiff claimed alleged toxin in child bath product "*may* be carcinogenic"); *Pinnacle Foods*, 2010 WL 1838715, at *2-3 (similar dismissal where plaintiff alleged potentially contaminated pot pies "*could* cause illness" if undercooked) (emphasis added); *Hughes v. Chattem, Inc.*, 818 F. Supp. 1112, 1119-1120 (S.D. Ind. 2011) (similar).

In *Koronthaly v. L'Oréal USA, Inc*., No. 07-CV-5588 (DMC), 2008 WL 2938045 (D.N.J. July 29, 2008) (*affirmed at* 374 Fed. Appx. 257 (3d Cir. 2010)), the court dismissed an economic injury theory, even though the plaintiff actually "purchased lipstick containing lead" at specific levels, quite unlike Plaintiffs' lesser allegations here. *Id*. at *1. Yet, the mere "potentiality" of a lead-associated future injury was "conjectural and hypothetical" (*id*. at *4) and "d[id] not provide [plaintiff] with an injury-in-fact," especially since the FDA "does not provide limitations on lead levels in lipstick." *Id*. at *5. That is why "[c]ases analogous to

-13-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  the present matter have routinely failed." *Id.* at *5.  In the end, "Plaintiff bought

2  lipstick and used the lipstick, only complaining that the lipstick's levels of lead are

3  unsatisfactory to her," a grievance Article III does not recognize.  *Id.*

4      Federal regulators' outlook on PFAS and the disputed biocides is relevant

5  when assessing whether Plaintiffs' apprehension about future disease reflects

6  certainly impending injury or hypothetical conjecture.  *See Koronthaly*, 2008 WL

7  2938045 at *5.  The FDA affirmatively *authorizes* certain PFAS in food contact

8  substances, having found to a "reasonable certainty" in a "rigorous review of

9  scientific data" that the authorized PFAS pose no threat of harm.  Ex. 3 at 3.

10  Meanwhile, using a benchmark of one one-hundredth of amounts of biocides found

11  harmless in animal studies, the EPA established safety tolerances for the disputed

12  biocides in the range of parts-per-million.  Plaintiffs' counsel's laboratory found

13  biocide levels in the range of parts-per-billion, and that was in samples *procured*

14  *for litigation*, not Plaintiffs' own meals.  Since there are a thousand millions in one

15  billion, a part-per-billion is one thousand times more diluted and scarce than a part-

16  per-million.  Yet, Plaintiffs' theory of economic injury asks the Court to assume

17  that PFAS in food packaging, or the faintest trace residues of biocide in food,

18  somehow portend impending physical danger.

19      The supposed causal link between exposure to PFAS or the disputed

20  biocides and future disease is an indispensable premise of Plaintiffs' theory of

21  economic injury:  it is what supposedly makes their purchase prices the injurious

22  proceeds of consumer fraud.  However, it amounts to conjecture, not the actual,

23  certainly impending injury Article III demands for claims predicated on

24  prospective threats.  *Clapper*, 568 U.S. at 407, 418; *Fruit Juice*, 831 F. Supp. 2d at

25  510-511, 512-513 (claim of exposure to "potential adverse health effects" or

26  "potential harm" is "insufficient for Article III standing," whether asserted as

27  future injury or as basis of economic injury at purchase).

28      In all, Plaintiffs' theory of existing injury is a medley of hypotheses:  should

-14-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

Plaintiffs get refunds *if* their purchases contained traces of PFAS or biocides, *if* it was a potentially pathogenic form of PFAS, *if* the PFAS or biocide was present in concentrations above a certain minimum level required to pose risk, *if* it was then actually likely to cause future injury?  That is speculation on top of conjecture.

### B.    Plaintiffs Also Lack Standing To Seek Prospective Relief.

The FAC's claims for corresponding injunctive and declaratory relief also require Rule 12(b)(1) dismissal because Plaintiffs lack Article III standing to seek prospective relief.  They claim they would not have purchased in the first place if they knew then what they know now (FAC, ¶¶ 20, 22), and now wise to their alleged deception, cannot be deceived anew, blocking any "actual and imminent, not conjectural or hypothetical" threat of future economic harm.  *Summers,* 555 U.S. at 493.  Moreover, their FAC evinces a subjective belief that CAVA products poisoned them.  This renders their pro forma allegations that they "continue[] to desire to purchase the Products" palpably implausible.  *Id*. at ¶¶ 21, 23.

### C.    The Liability Theory Lacks A Plausible Foundation.

The FAC further requires dismissal in total because the liability theory animating each cause of action lacks a plausible basis in the objective expectations of the reasonable consumer.  Whether sounding in purported misrepresentation or omission, in statute or common law, each claim ultimately rests on the premise that Plaintiffs somehow expected products with no chance of containing any detectable traces of PFAS or biocides.  Yet, the FAC pleads no plausible basis for Plaintiffs to hold such an expectation.  They do not identify any representation whatsoever about any of the assorted biocides in dispute.  As for PFAS, the FAC overtaxes the CAVA website's aspiration to eliminate PFAS from packaging, a statement that neither Plaintiff alleges relying upon or even seeing.  In fact, the FAC itself underscores how and why Plaintiffs could not plausibly expect the products to be utterly free of any trace of PFAS or biocide, given their elaborate allegations that PFAS exist practically everywhere that raw materials for consumer goods come

-15-

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  from, and the common knowledge of pesticides' widespread use in agriculture.

2  *E.g.*, Ex. 8 at 3 (FAC's own source asserts "most humans are continuously exposed

3  to pesticides mainly through dietary intake of fruits, vegetables and grains").

4      First, the law.  Plaintiffs must allege a plausible, objective basis for their

5  expectations that their CAVA purchases carried no possibility of containing a trace

6  of a form of PFAS or a biocide.  "The reasonable consumer test requires a

7  probability that a 'significant portion of the general consuming public or of

8  targeted consumers, acting reasonably in the circumstances, could be misled."

9  *Souter v. Edgewell Pers. Care Co.*, No. 20-cv-1486 TWR (BLM), 2022 WL

10  485000, at *7 (S.D. Cal. Feb. 16, 2022) (citing *Ebner v. Fresh, Inc.*, 838 F.3d 958,

11  965 (9th Cir. 2016)).  When assessing whether statements could deceive a

12  reasonable consumer, courts consider "representations in their complete context,"

13  *Loomis v. Slendertone Distrib., Inc.*, 420 F. Supp. 3d 1046, 1082 (S.D. Cal. 2019)

14  (Anello, J.), including by "tak[ing] into account all the information available to

15  consumers and the context in which that information is provided and used," *Moore*

16  *v. Trader Joe's Co.*, 4 F. 4th 874, 882 (9th Cir. 2021).  Dismissal is appropriate

17  where, as here, the theory of consumer deception is "simply not plausible."  *Souter*,

18  2022 WL 485000 at *7 (citing *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d

19  1188, 1193 (N.D. Cal. 2014)); *see also Moore v. Mars Petcare US, Inc.*, 966 F.3d

20  1007, 1018 (9th Cir. 2020) ("[I]f common sense would not lead anyone to be

21  misled, then the claim may be disposed of at [the] motion to dismiss stage.").

22      **1.    Plaintiffs' Expectations Lack A Plausible Basis.**

23      Here, Plaintiffs cannot tether their expectation that their CAVA purchases

24  had no chance of containing a detectable quantum of biocide to any such

25  representation by CAVA.  There was none.  The various statements that the FAC

26  challenges as purported misrepresentations say nothing at all about any of the

27  biocides.  FAC, ¶¶ 34-38, 42.  Much less do the challenged statements represent

28  that no CAVA product will possibly contain the slightest detectable trace.  *Id.*

-16-

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1   As for PFAS, there is only one statement on that subject. It appeared on the

2   CAVA website's "Newsroom," but the FAC does not even allege that the Plaintiffs

3   ever saw the website's "Newsroom" or its PFAS statement. Even if they did, that

4   statement frames the elimination of PFAS in packaging tentatively, simply as an

5   aspiration and a work-in-progress, not an accomplished matter of fact. It said

6   CAVA was "working to ensure" the elimination of PFAS in packaging "by mid-

7   2021" as part of an "ongoing" effort regarding which CAVA would "publicly

8   share progress." And so it did, announcing in March 2022 that pandemic-related

9   supply chain disruptions frustrated the company's ongoing efforts to "eliminat[e]

10  added PFAS" from packaging. Ex. 9.[4]  Plaintiffs' theory interprets the

11  "Newsroom" PFAS statements implausibly to say something they simply don't:

12  that CAVA already made certain its packaging has no chance of containing PFAS.

13  All of the remaining challenged statements are general characterizations and

14  praise of CAVA's aspirations towards such broad marketing concepts as health,

15  simplicity, spirit, flavor, and culture. *See Ariix, LLC v. NutriSearch Corp.*, 985

16  F.3d 1107, 1121 (9th Cir. 2021) (actionable statements must make a "specific and

17  measurable claim, capable of being proved false or of being reasonably interpreted

18  as a statement of objective fact"). They are assertions of CAVA's culinary and

19  business ethos generally—not specifically measurable claims about its products'

20  chemical composition. *Loomis*, 420 F. Supp. 3d at 1081 (Anello, J.)

21  ("[g]eneralized, vague, and unspecified assertions" are not actionable) (internal

22  citation and quotation marks omitted). None of the statements amount to promises

23  that Plaintiffs' CAVA purchases were certain to be free of any PFAS or biocides.

24  *Souter v. Edgewell Personal Care Co*., 542 F. Supp. 3d 1083, 1094-1095 (S.D.

25  Cal. 2021) ("No reasonable consumer would read 'hypoallergenic' and 'gentle' to

26  _____

27  [4] The FAC incorporates the full archived version of the CAVA website's
    "Newsroom" as it appeared on March 24, 2022, including the March 1, 2022
28  update respecting PFAS in packaging (FAC, ¶ 35, n. 19), making the archived
    "Newsroom" page fit matter for the Court's consideration on this Rule 12 motion.

-17-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

mean [hand wipes product] is completely free of ingredients that can cause an allergic reaction").

Courts roundly reject similar attempts by consumer plaintiffs to contort marketing statements into saying things they do not.  In fact, there are several examples in similar cases involving alleged contamination of consumable products.  The Eighth and Tenth Circuits recently affirmed dismissals when consumer plaintiffs claimed that dog food contained traces of heavy metals, supposedly contradicting representations that the dog food was "biologically appropriate."  *Song v. Champion Petfoods USA, Inc.,* 27 F.4th 1339, 1341 (8th Cir. 2022).  The phrase "biologically appropriate" could not plausibly indicate "a complete absence of heavy metals like arsenic, cadmium, mercury, and lead."  *Id*. at 1344.  Reasonable consumers could not interpret "biologically appropriate" to support an expectation that the manufacturer "eliminated all traces of heavy metals from the dog food."  *Id*.; *Renfro*, 25 F.4th at 1306 ("No reasonable consumer would interpret" the phrase that way).

The pattern holds in other cases alleging chemical contamination of consumer products.  Courts do not hesitate to dismiss where, as here, an overreaching theory of deception lacks footing in the defendant's representations. *E.g*., *Souter,* 542 F. Supp. 3d at 1094-1095; *Yu v. Dr. Pepper Snapple Grp., Inc*., No. 18-cv-6664 (BLF), 2020 WL 5910071, at *1, *5, *7 (N.D. Cal. Oct. 6, 2020) (per "weight of authority in the federal courts," "not plausible as a matter of law" to expect applesauce "free of any trace pesticides whatsoever," even if labelled "All Natural Ingredients"); *Rugg v. Johnson & Johnson*, No. 17-cv-05010-BLF, 2018 WL 3023493, at *3 (N.D. Cal. June 18, 2018) ("completely implausible" to take "the term 'hypoallergenic' on a product's label to mean that the product does not contain *any* ingredients, in any concentration, which could 'sensitize' the skin, cause cancer, or have *any* other negative effect") (emphasis original); *Parks v. Ainsworth Pet Nutrition, LLC*, No. 18-cv-6936 (LLS), 2020 WL 832863, at *1

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-18-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  (S.D.N.Y. Feb. 20, 2020) ("reasonable consumer[s] would not be so absolutist as

2  to require that 'natural' means there is no glyphosate, even an accidental and

3  innocuous amount, in the products"); *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d

4  170, 184 (E.D.N.Y. 2018) (affirmed, 813 Fed. Appx. 701 (2d Cir. 2020))

5  ("Florida's Natural" and "100% Orange Juice" labeling did not plausibly support

6  expectation that juice would contain no trace of synthetic herbicide); *In Re Gen.*

7  *Mills Glyphosate Litig*., No. 16-2869 (MJD/BRT), 2017 WL 2983877, at *5-*6 (D.

8  Minn. July 12, 2017) (dismissal with prejudice where label stating "Made with

9  100% Natural Whole Grain Oats" "did not represent or warrant that [granola bars]

10  would be free from trace glyphosate" because "[i]t would be nearly impossible to

11  produce a processed food with no trace of any synthetic molecule").[5]  The FAC

12  here similarly overstretches the labeling.

### 2. Plaintiffs' Own Allegations Further Render Their PFAS Expectations Implausible.

14     The FAC does not just *fail* to plead a plausible, objective basis for Plaintiffs'

15  expectations about PFAS and biocides.  On the PFAS theory, the FAC goes

16  further, spelling out why Plaintiffs *cannot* plausibly plead an objective expectation

17  that their CAVA packaging had no chance of containing any PFAS.  Illogically,

18  Plaintiffs say they expect PFAS practically everywhere, but not in food packaging.

19     Plaintiffs allege that reasonable consumers appreciate the alleged risks of

---

[5] Outside the trace contamination context, numerous other cases illustrate dismissal's necessity when the theory of consumer expectations lacks footing in labeling about product composition or safety.  *E.g., Rice v. Sunbeam Prods., Inc*., No. CV 12-7923-CAS-(AJWx), 2013 WL 146270, at *1, *5, *6, (C.D. Cal. Jan. 7, 2013) (dismissing safety misrepresentation theory based on Crock-Pot's capacity to burn users with 300º exterior temperatures, despite marketing as "safe for household use," because statement said nothing about device's exterior temperature or corresponding danger, and "a plaintiff must allege a plausible interpretation of a representation that defendant actually made"); *Moreno v. Vi-Jon, LLC*, No. 20-cv-1446 JM (BGS), 2021 WL 5771229, at *5, *1 (S.D. Cal. Dec. 6, 2021) ("unassailable reality" that hand sanitizers "d[id] not represent that they will kill any of the serious pathogens listed by Plaintiff['s] complaint, though label said product "kills 99.99% of germs*" and is "[e]ffective at eliminating more than 99.99% of many common harmful germs and bacteria").

-19-

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  PFAS, knowing enough to fear their potential presence in products they consume.

2  According to the FAC, today's "consumers have become aware of the dangers of

3  PFAS exposure."  FAC, ¶ 2; *id*. at ¶ 87 (alleged "health effects associated with

4  PFAS are well known" already).  It also says consumers "seek to minimize their

5  exposure to harmful biocides." *Id*. at ¶ 3.  Indeed, the FAC posits that "chemicals

6  in food" have become consumers' top "food safety" concern, "guiding consumer

7  choices." *Id*. at ¶¶ 28-29.  Plaintiffs say they typify these consumers. *Id*. at ¶ 142.

8       At the same time, Plaintiffs and reasonable consumers also know that food

9  and its packaging are made from raw materials that can only come from the

10 environment.  Yet, in graphic factual averments, the FAC expounds Plaintiffs'

11 view that PFAS are prevalent virtually everywhere.  FAC, ¶¶ 96-97.  Plaintiffs say

12 that PFAS have already contaminated the environment "around the globe through

13 multiple pathways." *Id*. at ¶ 96.  The contamination allegedly extends to

14 "waterways & groundwater," the ocean, the atmosphere, "to crops," and

15 throughout "the food chain." *Id*. at ¶¶ 96-97.  PFAS are so "widespread" in

16 products and the environment, they say, that "it is likely that the majority of the

17 human population is [already] affected by" exposure to what they call "highly

18 persistent" PFAS.  FAC, ¶¶ 76, 83; *id*. at ¶ 77 ("extreme persistence"); *id*. at ¶ 80

19 ("widespread exposure").  The FAC's primary source says 97% of Americans have

20 "PFAS in the blood" because the "widespread" chemicals are in "air, soil, and

21 water, including sources of drinking water," "intermingled with our natural

22 environment."  Ex. 10 at 2-3.  Basically, Plaintiffs already expect PFAS throughout

23 nature's resources.  Where else did they expect CAVA's products to come from?

24      These allegations foreclose Plaintiffs' theory of reasonable consumer

25 expectations.  It posits, irreconcilably, that Plaintiffs understand "highly persistent"

26 PFAS well enough to stay alert to even their potential presence in consumer

27 products, but simultaneously expected no chance that some form of PFAS might

28 find its way into food packaging made with raw materials from a natural

-20-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

environment they say is widely, even irretrievably polluted with "highly persistent" PFAS.  That is implausible.

### D.   Plaintiffs' Claims Remain Unpled Under Rules 8 Or 9.

If the Court were to find that Plaintiffs hold standing and assert a plausible theory, their claims would remain factually unpled.  Most fundamentally, each of their causes of action ultimately relies upon the supposition that their own CAVA purchases actually contained injurious levels of some type of PFAS or biocide likely to cause them future disease.  However, they have not even baldly asserted as much, let alone alleged such facts with the plausibility that Rule 8(a) demands.  Plaintiffs do not even allege that CAVA actually exposed them to any forms of PFAS or biocide.  Courts have dismissed similarly lacking allegations.  *See Andrews*, 2019 WL 6520045, at *3; *McCrary v. Elations Co., LLC*, 2013 WL 6402217, at *4 (C.D. Cal. Apr. 24, 2013).

This and other voids in their pleading become even more gaping when measured against Rule 9(b)'s particularity standard, which governs the entire FAC since all its claims sound in the same course of allegedly fraudulent conduct.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003); *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 443 (N.D. Cal. 2018) (dismissing UCL, CLRA, and FAL claims for failure to satisfy Rule 9(b)).

Aside of the basic question of Plaintiffs' exposure to *any* form of PFAS or biocide, there's the question of what chemical(s) their purchases supposedly contained.  What identifiable compound out of "thousands" of "divers[e]" PFAS was in the packaging materials Plaintiffs ate from?  Which of the several disputed biocides was supposedly in the foods Plaintiffs ate?  Unable to plead the "circumstances constituting fraud" against either Plaintiff, the FAC impermissibly leaves these critical matters to guesswork.  FED. R. CIV. PROC. 9(b).  It simply gestures at the entire legion of PFAS, and at an assortment of biocides, as if to say, "We can fight about naming which chemicals you actually exposed us to later in

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

discovery." That's not how it works. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009) (pleading standard "does not unlock the doors of discovery" for plaintiff unable to "state[] a plausible claim").

Indeed, in chemistry it is too fundamental to dispute that different chemical compounds, composed of different elements, have consequently different properties and effects. *E.g.*, FAC, ¶¶ 85, 77 ("diversity" of "thousands" of PFAS); Ex. 7 at 4 (FAC's source admits "the PFAS class comprises distinct substances with very different structures and properties," "some bioaccumulate while others do not," and "[s]ome PFAS are considered of low health concern"). Plaintiffs chose to frame a theory of fraud based on chemistry, but can't even plead its most basic fact: what chemicals present in their own purchases form the purported basis of liability. Before permitting claimants to besmirch a restauranteur defendant's good reputation with allegations of poisoning by fraud, Rule 9(b) demands that they plead more than the accusation, "It's possible that you might have sold us traces of any among thousands of PFAS compounds or perhaps one of this handful of biocides." *See Vess*, 317 F.3d at 1104 (Rule 9(b)'s particularity requirement reflects a "purpose of protecting a defendant from reputational harm" of unfounded charges of wrongdoing).

Moreover, Plaintiffs fail to allege with particularity that they relied on any of the alleged misrepresentations. To allege reliance with sufficient particularity, Plaintiffs' allegations must contain "an account of the time, place, and specific content of the false representations" on which each Plaintiff relied (*Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)), and must be accompanied by the "who, what, when, where, and how" of the misconduct charged. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Yet, in highly conclusory terms, Plaintiffs merely recite that they reviewed unspecified "*marketing materials and in-store signage* related to [CAVA's] Products," at an unidentified restaurant location; through an undisclosed medium; and at an unspecified time "[p]rior to

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1  [their] purchase," which Plaintiffs suggest may have been "at numerous points

2  over the past few years, including as recently as" January or March 2022.  FAC, ¶¶

3  20, 22.  Tellingly, despite a second round of pleading, Plaintiffs still do not allege

4  that they ever saw, much less relied upon, the website's PFAS statement or

5  anything else in CAVA's online "Newsroom," as opposed to in-store signage and

6  other marketing materials.  The absence of any reliance-related details is

7  dispositive.  *See, e.g.*, *Gutierrez v. Johnson & Johnson Consumer, Inc.*, 2021 WL

8  822721, at *5 (S.D. Cal. Jan. 22, 2021) ("Merely supplying a list of advertisements

9  and the misleading statements…does not show which specific advertisement or

10  statement that [Plaintiffs] actually saw…[and] fall[s] short of the specificity

11  required by Rule 9(b)."); *In Re Hydroxycut Mktg. & Sales Pracs. Litig.*, 2011 WL

12  1002190, at * 5 (S.D. Cal. Mar. 21, 2011) ("Although [p]laintiff describes certain

13  marketing and promotional materials that she claims were misleading, [p]laintiff

14  fails to specify which materials she actually saw and relied on").[6]

15       As to their scienter-based claims (counts V-IX), Plaintiffs fail to plead that

16  CAVA knew or was deliberately reckless with respect to its allegedly misleading

17  representations.  Instead, Plaintiffs allege pure conclusions that CAVA had

18  "knowledge that the Products packaging contained harmful substances," FAC ¶

19  121, and "would have had actual knowledge for years that the Products[']

20  packaging contains harmful chemicals such as organic fluorine/PFAS and

21  biocides," *id.* ¶ 126.  Asserting ultimate legal conclusions is insufficient to plead

22  scienter.  *See, e.g.*, *Marshall v. Gen. Motors/Corp. Serv. Co.*, 2019 WL 2642661, at

23  *6 (S.D. Cal. June 27, 2019) (dismissing fraud claim where "[p]laintiff d[id] not

24  provide specific allegations as to [defendant's] scienter [or] intent to defraud" and

25

26  _____
    [6] *See also Brown v. Madison Reed, Inc.*, 2021 WL 3861457, at *1 (N.D. Cal. Aug.
27  30, 2021) (dismissal where plaintiffs generally alleged that they relied on
    misrepresentations on defendant's website and packaging stating that the product
28  was "free of ammonia," "resorcinol," and "PPD," but "fail[ed] to specifically
    allege which, if any, of those statements they actually saw and relied upon").

-23-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

1   pleaded these "mandatory elements…only at the grossest levels of generality").

2   **E.    Plaintiffs Have No Claim For Omission-Based Liability.**

3          Under California law, no omission is actionable unless it is "contrary to a

4   representation actually made by the defendant, or an omission of a fact that the

5   defendant was obliged to disclose."  *Hodsdon v. Mars, Inc*., 891 F.3d 857, 861 (9th

6   Cir. 2018).  The FAC cites no representation whatsoever about any of the disputed

7   biocides because there was none.  And, as set out above, it simply overworks the

8   CAVA website's aspirations about elimination of PFAS, a statement the Plaintiffs

9   do not allege relying upon or even encountering in the first place.  *See Ebner*, 838

10  F.3d at 966 (though plaintiff claimed 25% or more of labeled quantity did not

11  dispense, label reflected "absence of any statement or other depiction anywhere on

12  the package about lip product accessibility").

13         Nor is there any duty to disclose.  Faint traces of PFAS or biocides are

14  hardly an unreasonably dangerous safety hazard, particularly given that the

15  governing federal agencies affirmatively authorized forms of PFAS and the

16  disputed biocides in food applications.  *See Wilson v. Hewlett-Packard Co*., 668

17  F.3d 1136, 1141 (9th Cir. 2012) (failure to allege safety hazard despite supposedly

18  flaming laptops).  That is the end of the question.  *Id.*; *Stewart v. Electrolux Home

19  Prods*., No. 1:17-cv-01213-LJO-SKO, 2018 WL 1784273, at *7 (E.D. Cal. Apr.

20  13, 2018) (failure to plead safety concern despite allegedly failing oven

21  thermostat).  In any event, Plaintiffs make no quarrel with the products' central

22  functions as delicious meals.  *See Hodsdon*, 891 F.3d at 862.  Nor have Plaintiffs

23  adequately pled that whatever traces of PFAS or biocides their purchases might

24  have contained crossed some (unpled) quantity or level of physical danger

25  necessary to make an omission material.  *See id*. at 863; part III. A., *supra*.

26         Even if Plaintiffs could overcome those threshold barriers, their omission

27  theory would still falter because they cannot meet any of the remaining factors that

28  would be necessary to manifest a duty to disclose.  *See Hodsdon*, 891 F.3d at 863.

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-24-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1   They have no fiduciary relationship with CAVA.  *See* FAC (no such allegation).

2   Further, CAVA indisputably made no representation that the foods would be free

3   of any trace of biocide, and Plaintiffs do not even allege exposure to the website

4   PFAS statement their FAC overstretches.  Thus, Plaintiffs are left to claim that

5   CAVA concealed its supposedly exclusive knowledge that packaging materials

6   might contain PFAS or that foodstuffs might bear trace residues of pesticides.

7   Plaintiffs' own allegations negate that contention.  Rather than alleging any

8   affirmative acts of concealment, the FAC asserts the opposite.  It says CAVA

9   advertised the potential for PFAS in packaging materials on its own website.

10   Similarly, the FAC points to other publications announcing that potential to large

11   audiences (FAC, ¶¶ 6, 11, 45-49, 57), generating "consumer backlash."  *Id*. at ¶ 53.

12   The widespread presence of pesticide residues in food is also public knowledge.

13   *E.g*., *id*. at ¶ 3, n. 5 (*Consumer Reports* article entitled, "Stop Eating Pesticides").

14   In their own telling, the matters in dispute are publicly disclosed, widely known,

15   and not secret.

16   **IV.    CONCLUSION**

17   Plaintiffs have enjoyed two opportunities to plead valid claims but cannot.

18   The second attempt followed full notice of the grounds for dismissal.  *See Farren*

19   *v. Select Portfolio Servicing, Inc.*, No. 2:16-cv-01077-JAM-DB, 2017 WL

20   1063891, at *2 (E.D. Cal. Mar. 20, 2017) (dismissing claims without leave to

21   amend where "Plaintiffs had notice of Defendant's arguments due to the previous

22   Motion to Dismiss raising nearly identical issues."); *Low v. LinkedIn Corporation*,

23   900 F. Supp. 2d 1010, 1032 (N.D. Cal. 2012) ("Given that Plaintiffs were on

24   notice…and failed to cure the defects in the Amended Complaint, it appears that

25   leave to amend would likely be futile.")  The Court should dismiss the entire FAC

26   with prejudice.

27

28

Dated:  October 3, 2022                        GORDON REES SCULLY
                                               MANSUKHANI, LLP


                                       By:    *s/ Justin D. Lewis*
                                              Miles D. Scully
                                              Justin D. Lewis
                                              Attorneys for defendant
                                              CAVA GROUP, INC.

**Gordon Rees Scully Mansukhani, LLP**
**101 W. Broadway, Suite 2000**
**San Diego, CA 92101**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**