

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
aleslie@bursor.com

*Attorneys for Plaintiff*

Formatted: Footer distance from edge: 0.2"

Formatted: Line spacing: Exactly 14 pt

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NEIL HAMMAN and MICHAEL STEWART, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CAVA GROUP, INC.,<br><br>Defendant. | Case No. 22cv0593-MMA-MSB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Deleted: FIRST

Formatted: Tab stops: 2.68", Right + Not at 1.99"

Deleted: s

Deleted: A

Formatted: Tab stops: 6.56", Right + Not at 6"

Deleted: – JURY TRIAL DEMANDED

Plaintiffs Neil Hamman and Michael Stewart ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Defendant Cava Group, Inc. ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF ACTION

1. Plaintiffs bring this Class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's grain and salad bowls (the "Products"), which are unfit for human consumption because the packaging in which they are contained—and is essential and integral to delivering the Products to the consuming public[1]—contain heightened levels of organic fluorine and unsafe per-and polyfluoroalkyl substances ("PFAS").[2]

2. Per- and polyfluoroalkyl substances ("PFAS") are a class of synthetic chemicals that have a negative impact on human health and the environment.[3] Recently, consumers have become aware of the dangers of PFAS exposure.[4]

[1] Due to the integral and essential nature of the packaging, the term "Products" or "Product" is used herein to denote both the Products and the Products' packaging.

[2] Discovery may reveal that additional Cava's products are within the scope of this Complaint. Accordingly, Plaintiffs reserve the right to include additional food products identified throughout the course of discovery given the substantial similarity in the harm presented.

[3] Nat'l Inst. of Env't Health Sciences, Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS), Nat'l Insts. Of Health U.S. Dept. of Health and Human Servs., https://www.niehs.nih.gov/health/materials/perfluoroalkyl_and_polyfluoroalkyl_substances_508.pdf (last visited Feb. 28, 2023); Francisca Pérez, et al., Accumulation Of Perfluoroalkyl Substances In Human Tissues, 59 Environ. Int'l 354 (2013).

[4] *See e.g.* LastWeekTonight, *PFAS: Last Week Tonight With John Oliver (HBO)*, YouTube (Feb. 28, 2023), https://www.youtube.com/watch?v=9W74aeuqsiU and *FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House, https://bit.ly/3DZvZba (last visited Feb. 28, 2022).

**Deleted:** Plaintiffs also bring their case under a separate theory: several of Defendant's Products have been tested and determined to contain various cancer causing and environmentally harmful biocides, which pose an undue risk to the health and safety of consumers.…

**Formatted:** Line spacing: Exactly 14 pt

**Deleted:** Aug. 3, 2021

**Deleted:** Oct. 4

**Deleted:** 1

**Deleted:** Aug. 3

**Deleted:** 1

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** ¶ S

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED

3. On August 5, 2020, Defendant announced to its consumers that "[a]s part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging *continues* to be responsibly sourced, compostable, functional, and *now* PFAS-free. We will eliminate PFAS for our food packaging by mid-2021, and will publicly share progress on our commitment in the year ahead."[6] *See infra* ¶ 35.

4. At the time of the statement, however, Defendant was in receipt of material information showing that its grain and salad bowls (the "Products") were unfit for human consumption because the packaging in which they were contained—and which are essential and integral to delivering the Products to the consuming public[7]—were not free of organic fluorine, which is the leading indicator of whether the Products contain unsafe PFAS.[8]

5. Specifically, independent research conducted by Mind the Store and Toxic-Free Future and performed at an independent laboratory in February 2020, and published on August 6, 2020, determined that the Products' packaging contained heightened levels of organic fluorine.[9]

6. Mind the Store and Toxic-Free Future tested two of Defendant's grain and salad bowls. The first test revealed that the Products' packaging contained 660 parts per million (ppm) of total organic fluorine.

7. The second test revealed that the Products' packaging contained 945ppm of total organic fluorine.

[6] Emphasis added.

[7] Due to the integral and essential nature of the packaging, the term "Product" is used herein to denote both the Product and the Product's packaging.

[8] For additional context, products containing over 100 ppm of organofluorine have recently been banned by a series of legislative bills in California due to the toxic and environmentally destructive nature of these compounds. *See California Issues New PFAS Consumer Product Regulations,* Exponent (Feb. 28, 2023), https://bit.ly/3ug4hVP.

[9] Jen Dickman, *et al., Packaged in Pollution: Are food chains using PFAS in packaging?*, Toxic-Free Future, https://toxicfreefuture.org/packaged-in-pollution/ (last visited Feb. 28, 2023).

Deleted: <#>At the same time, consumers also seek to minimize their exposure to harmful biocides, which also have harmful health and environmental impacts.[5]¶

Deleted: Oct. 15

Deleted: 1

Deleted: Aug. 3

Deleted: 2

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 2

Formatted: Border: Top: (No border)

8. Prior to the release of those results on August 6, 2020, Mind the Store and Toxic-Free Future contacted Defendant and informed Defendant of those results.

9. Despite the receipt of this material information, Defendant affirmatively misrepresented that information in its confusing and contradictory press release, and continued to hold out its Products as safe, healthy, and sustainable.

Deleted: concealed what it knew and instead

Deleted: and failing to apprise consumers of the existence of organic fluorine and PFAS in its Products in the years ahead.…

10. Subsequent testing performed by Consumer Reports at an independent laboratory more than two years later determined that the Products continued to contain heightened levels of fluorine in the amount of 508.3 ppm.[10]

11. Additional testing commissioned by Plaintiffs' counsel in July of 2022 and conducted by Galbraith's Laboratories confirmed the continued existence of organic fluorine amounts over 100 ppm in the Products' packaging.

12. These tests results conducted across more than two years and across geography are concerning as PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[11]

13. In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health

[10] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited Feb. 28, 2023).

[11] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

Deleted: August 18

Deleted: 2

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 3

Formatted: Border: Top: (No border)

effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[12]

14. Based on Defendant's representations, reasonable consumers—like Plaintiffs who relied on Defendant's "healthy" and "sustainable" representations as set out on its website and in-store signage—would expect that the Products can be safely purchased and healthily consumed as marketed and sold. However, the Products are not safe or healthy, posing a significant health risk to unsuspecting consumers;. nor are the Products sustainable as packaging treated with such high levels of organic fluorine are not responsibly sourced and are not compostable.

15. Accordingly, Plaintiffs bring this Class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased Defendant's Products for the following claims: (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq.* and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Fraudulent Misrepresentation; (9) Negligent Misrepresentation; (10) Quasi-Contract / Unjust Enrichment; and (11) Breach of Express Warranty.

**THE PARTIES**

16. Plaintiff Neil Hamman is a natural person and citizen of California who resides in Ramona, California. Plaintiff Hamman has purchased the Products from Defendant at numerous points over the past few years, including as recently as March 2022 from a Cava located in La Jolla, California. Prior to his purchase, Mr.

---

[12] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited Feb. 28, 2023).



**Deleted:** <#>In addition to screening the Products for PFAS, counsel has also tested Defendant's food Products for synthetic biocides and found trace amounts of these harmful chemicals.¶

**Deleted:** ¶
N

**Deleted:** Additionally, food containing trace amounts of harmful biocides indicates unsustainable agricultural practices in Defendant's supply chain.¶
<#>Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiffs that their Products are unsafe, unhealthy, or harmful to the environment, contains heightened levels of fluorine indicating the presence of PFAS, or should otherwise be approached with caution.¶

**Deleted:** <#>Yet, neither before nor at the time of purchase does notify consumers like Plaintiffs that their Products are unsafe, unhealthy, or harmful to the environment, contains heightened levels of fluorine indicating the presence of PFAS, or should otherwise be approached with caution.¶

**Deleted:** (8) Fraudulent Omission or Concealment;

**Deleted:** 9

**Deleted:** 10

**Deleted:** 1

**Deleted:** 2

**Deleted:** Aug. 18, 2022

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** S

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 4

**Formatted:** Border: Top: (No border)

Hamman reviewed Defendant's marketing materials and in-store signage related to his Products, including those set out herein, including that the Products were healthy, safe, and sustainable. Mr. Hamman understood that based on Defendant's claims, that Products were healthy, safe for consumption, and otherwise a sustainable product. Mr. Hamman reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations, Mr. Hamman suffered and continues to suffer, economic injuries.

17. Mr. Hamman continues to desire to purchase the Products from Defendant. However, Mr. Hamman is unable to determine if the Products are actually healthy, safe, and sustainable. Mr. Hamman understands that the composition of the Products may change over time. But as long as Defendant continues to market its products as "healthy" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products. Mr. Hamman is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

18. Plaintiff Michael Stewart is a natural person and citizen of California who resides in San Diego, California. Plaintiff Stewart has purchased the Products from Defendant at numerous points over the past few years, including as recently as January 2022 from a Cava located in San Diego, California. Prior to his purchase, Mr. Stewart reviewed marketing materials and in-store signage related to his Products, including those set out herein, including that the Products were healthy, safe, and sustainable. Mr. Stewart understood that based on Defendant's claims, that

Deleted: and omissions

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 5

Formatted: Border: Top: (No border)

Products were safe for consumption, and otherwise a sustainable product. Mr. Stewart reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations, Mr. Stewart suffered and continues to suffer, economic injuries.

Deleted: and omissions

19. Mr. Stewart continues to desire to purchase the Products from Defendant. However, Mr. Stewart is unable to determine if the Products are actually healthy, safe, and sustainable. Mr. Stewart understands that the composition of the Products may change over time. But as long as Defendant continues to market its products as "healthy" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products. Mr. Stewart is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

20. Defendant Cava Group, Inc. ("Defendant") is a foreign corporation with its principal place of business located in Washington, D.C.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 6

Formatted: Border: Top: (No border)

22. This Court has personal jurisdiction over Defendant transacts substantial business in this District, has substantial aggregate contacts with this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout this District, and purposefully availed itself of the laws of the State of California in this District, because the acts and transactions giving rise to this action occurred in this District.

23. This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because a substantial part of the events and acts giving rise to Plaintiffs' claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A. Food and Consumer Preferences

24. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[13]

25. At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices. One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[14]

26. These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[15]

[13] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited Feb. 28, 2023).

[14] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-conent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 18, 2022).

[15] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-

**Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Deleted:** , omissions,

**Deleted:** ¶

**Deleted:** <#>///¶
///¶
///¶
///

**Deleted:** Aug. 1

**Deleted:** 8, 2022

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** S

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 7

**Formatted:** Border: Top: (No border)

27. Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[16]

28. Also, "nearly two-thirds (64 percent) of Americans are willing to pay more for sustainable products. . . [and] 78 percent of people are more likely to purchase a product that is clearly labeled as environmentally friendly."[17]

29. Thus, there is enormous incentive for companies such as Defendant to market their products as safe, healthy, and sustainable. Indeed, Defendant has repeatedly and pervasively touted these considerations as reasons to purchase the Product over competitors, creating a context for consumers to believe that the Products are indeed safe, healthy, and sustainable. Examples of these representations are included below.

30. These include statements made directly on Defendant's website such as "We believe you shouldn't have to choose healthy over satisfying . . . And we work hard every single day to make sure that promise stands."[18]

31. Defendant states on its website that "At Cava, we are about our impact on our communities and the world. As a part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free."[19] An image of this is included below:

---

trends-are-changing-the-game-for-food-beverage-processors/ (last visited Aug. 18, 2022).

[16] Made Safe, "What Shoppers Want," at 3.

[17] Maggie Hanna, Consumers make a plea for sustainability, The Produce News (June 21, 2021), https://theproducenews.com/sustainability/consumers-make-plea-sustainability (last access Feb. 28, 2023).

[18] Cava, "Cava Culture," https://cava.com/culture (last accessed Apr. 26, 2022).

[19] Cava, "Newsroom," https://web.archive.org/web/20220324103526/https://cava.com/newsroom (last accessed Apr. 26, 2022).



Formatted: Default Paragraph Font

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 8

Formatted: Border: Top: (No border)

August 5, 2020

## Eliminating PFAS From Our Food Packaging

At CAVA, we care about our impact on our communities and on the world at large. As part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free. We will eliminate PFAS from our food packaging by mid-2021, and will publicly share progress on our commitment in the year ahead.

32. Defendant furthers its image as a go-to restaurant for healthy foods, stating directly on its website that it only uses "Simple Ingredients." An example is included below:




33. Defendant also highlights these attributes in its in-store signage, stating that "Food . . . cannot be artificial" and that "Cava Grill is evolved to be smarter, healthier, and more transparent." An example of this representation is set out below:

**Formatted:** Indent: Left: 0.5", No bullets or numbering

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** s

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 9

**Formatted:** Border: Top: (No border)

34. To this point, Defendant also partnered with the marketing firm, Homestead, to "[d]evelop[] visuals" that convey its sentiment to consumers. As Homestead tells it, "[l]ively colors and honest foods led to a series of in-store posters the promote the brand's mission," including those such as the following:




Deleted: ¶

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 10

Formatted: Border: Top: (No border)

35. Indeed, Cava's CEO, Brett Schulmann, also echoed Defendant's approach to food, noting that "[p]eople are eating out more, and they're seeking higher-quality ingredients. When we take these naturally health nutritional profiles, great flavors, and fulfilling foods to a reasonable price point, we're solving a problem for a variety of consumers on the go."[20]

36. Mr. Schulmann further remarked that a part of this requires "an atmosphere of transparency[.]"[21]

37. Mr. Schulmann has also noted that Cava's "better for your body" and that "consumers are mindful about what they're ingesting[.]"[22]

[20] QSR, "What Inspires Cava CEO Brtt Schulman," (Oct. 2017), https://www.qsrmagazine.com/start-finish-what-inspires-execs/what-inspires-cava-ceo-brett-schulman (last accessed Feb. 28, 2023).

[21] *Id.*

[22] Gary Stern, "Cava: Healthy Mediterranean Chain Expanding And Acquiring," *Forbes* (Nov. 15, 2019), https://www.forbes.com/sites/garystern/2019/11/15/cava-healthy-mediterranean-chain-expanding-and-acquiring/?sh=3987bf901434 (last accesseFeb. 28, 2023).

Deleted: ¶

Deleted: Aug. 18, 2022

Deleted: d Aug. 18, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 11

Formatted: Border: Top: (No border)

38. Mr. Schulmann has also stated that "At Cava . . . We want to show consumers that sustainable behavior can be the norm, easy, enjoyable and cost less."[23]

39. Any doubt about Cava's attempt to boost its health and sustainable bona fides is dispelled by the in-depth profile of Cava written by Menus of Change, run by the Culinary Institute of America. The organization wrote that "Cava Grill . . . targets health-conscious consumers," and "emphasizes local sourcing and the quality of what it sources. The chain sells diners on transparency, simplicity, and purity."[24]

40. Plaintiffs saw and relied on Defendant's marketing, including its in-store signage and website material outlined above in making their purchases. Plaintiffs believed that Defendant genuinely prioritized health, sustainability, and transparency, and did not expect that Defendant, who proudly touted these qualities, to hide the biggest secret of all: the existence of unsafe levels of organic fluorine which is indicative of cancer causing PFAS in its packaging.

**B. PFAS In Defendant's Food Packaging Is Harmful To Humans And The Environment**

**1. Several Tests Demonstrate That Defendant's Salad & Grain Bowls Contain Heightened Levels of Organic Fluorine, Indicating PFAS**

41. In February 2020, Mind the Store and Toxic-Free Future conducted a study of the levels of organic fluorine and PFAS in food packaging for various restaurants, including Defendant.[25]

42. Researchers stated that "[w]e found that health-conscious customers might feel good about getting a full serving of veggies, the packaging it comes in is

[23] Suzanna Blake, "How Some Operators are Striving for Better Sustainability Standards," (Jan. 2022), https://www.qsrmagazine.com/content/how-some-operators-are-striving-better-sustainability-standards (last accessed Feb. 28, 2023).

[24] Menus of Change, "Cava Grill," https://www.menusofchange.org/case-studies/cavagrill (last accessed Feb. 28, 2023).

[25] Jen Dickman, "Packaged in Pollution: Are food chains using PFAS in packaging?" Safer Chemical Healthy Families, https://saferchemicals.org/packaged-in-pollution/.



Deleted: , along with trace amounts of harmful biocides.

Deleted: Aug. 18, 2022

Deleted: Aug. 18, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: S

Deleted: A

Deleted: – JURY TRIAL DEMANDED 12

Formatted: Border: Top: (No border)

anything but healthy. Nearly all samples tested from Cava [and other 'healthy' chains] appeared to be PFAS-treated."

43. Researchers further wrote "Think you're eating healthy? Think again. Toxic PFAS persists in packaging from health-conscious chains."




44. The first test of Defendant's salad and grains bowl revealed that the packaging contained 660 parts per million of organic fluorine.

45. The second test of Defendant's salad and grains bowl revealed that the packaging contained 945 ppm of organic fluorine.

Formatted: Indent: Left: 0.5", No bullets or numbering

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 13

Formatted: Border: Top: (No border)

**Nearly half of tested food packaging items likely contained PFAS chemicals**

| Number of samples that tested above the fluorine screening level out of the total number tested in each category | | | Burger or sandwich | | Fries, other fried items, or desserts | | Salads, warm bowls, or other meals | |
|---|---|---|---|---|---|---|---|---|
| | | | WRAPPER | CARDBOARD CONTAINER | PAPER BAG | PAPERBOARD CONTAINER | MOLDED FIBER BOWL | MOLDED FIBER TRAY |
| Burger King | 7,000+[1] stores | 3 out of 8 | ●○○[2] | | ●● | ○○○ | | |
| McDonald's | 15,000+[1] stores | 3 out of 9 | ○○○[2] | ● | ●● | ○○○ | | |
| Wendy's | 6,000+[1] stores | 1 out of 4 | ○[2] | | ● | ○○ | | |
| CAVA | 100+ stores | 4 out of 4 | ● | | ● | | ●[2] | ● |
| freshii | 300+[1] stores | 1 out of 2 | ○ | | | | ●[2] | |
| sweetgreen | 100+ stores | 2 out of 2 | | | | | ●●[2] | |
| TOTAL | | 14 out of 29 | ●●○○○○○○○ | ● | ●●●●●● | ○○○○○○○○ | ●●●● | ● |

[1] Number of stores in the U.S. and Canada.
[2] We collected and tested more than one of the same kind of wrapper or bowl from different locations in the U.S., but are reporting each set as 1 to reflect the number of unique items. For details, see our methodology page.

46. To avoid consumer backlash, Defendant immediately announced on August 5, 2020, the day before these test results were made public, that "we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free."

47. In response, Defendant received credit from Mind the Store and Toxic-Free Future for removing PFAS from its packaging.

48. Implicit in Defendant's response is its acknowledgment that testing for organic fluorine is a valid method to test for PFAS. Afterall, even Defendant equated Mind the Store and Toxic-Free Future's findings of organic fluorine with a finding of PFAS.

49. By receiving the positive credit, Defendant avoided the consumer backlash endured by other restaurants, such as McDonald's, that were found to have

**Deleted:** :

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** S

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 14

**Formatted:** Border: Top: (No border)

high levels of organic fluorine—but none as high as Defendant—and that had not made similar public commitments.

50. For example, Mind the Store launched an online petition to have McDonald's remove PFAS from its packaging.

51. An example of the differing publicity these two restaurants received is set out below:




52. Defendant's announcement allowed it to save face, but its promises amounted to little.

53. On March 24, 2022, Consumer Reports released its study, "Dangerous PFAS Chemicals Are in Your Food Packaging."[26]

[26] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports* (Mar. 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last accessed Feb. 28, 2023).



Deleted: Aug. 18, 2022
Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: s
Deleted: A
Deleted: – JURY TRIAL DEMANDED 15
Formatted: Border: Top: (No border)

54. Consumer Reports noted that "[t]o see how often PFAS are still found in food containers, Consumer Reports tested more than 100 food packaging products from restaurants and grocery chains."[27]

55. Consumer Reports wrote that "Chains that promote healthier fare such as Cava . . . also had some packaging that contained PFAS[.]"[28]

56. Despite Defendant's representations noted above, that it's Products do not contain PFAS—which, according to Michael Hansen, PhD, senior scientist at Consumer Reports, "no company should tell consumers that their products are 100 percent free of PFAS"[29]—Defendant's Products still contained a significant amount of organic fluorine, indicating intentional use of PFAS. These results are as follows:

| Cava | |
|---|---|
| Fiber tray for kids meal | 548.0 |
| Fiber bowl for grains, salad | 508.3 |
| Wrapper for mini Pita, pita Sandwich | 280.0 |
| Bag for pita chips | 260.0 |
| Wrapper for pitas | 202.0 |
| Wrapper for sides | 13.3 |

57. Subsequent testing commissioned by Plaintiffs' counsel in July of 2022 and found 1147 ppm of organic fluorine in the fiber bowl lid and 1044 ppm of organic fluorine in the salad/grain bowl itself.

**2. Organic Fluorine Testing Represents A Scientifically Valid Method of Testing For PFAS**

58. As noted by Consumer Reports, "test[ing] products for their total organic fluorine content . . . is the simplest way to assess a material's total PFAS

[27] *Id.*
[28] *Id.*
[29] *Id.*



Deleted: '
Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: S
Deleted: A
Deleted: – JURY TRIAL DEMANDED 16
Formatted: Border: Top: (No border)

content. That's because all PFAS contain organic fluorine, and there are few other sources of the compound."[30]

59. Indeed, this approach "is exactly what the food packaging industry does to determine whether PFAS w[ere] 'intentionally added' and can be composted or not."[31]

60. The Biodegradable Products Institute ("BPI") has adopted 100ppm as a threshold. Likewise, the Supply Chain Solutions Center ("SPSC") notes that it "recommends that companies systematically screen [their products] using a total fluorine method and investigate levels over 100 [ppm], which indicates intentional use."[32]

61. SCSC notes that "[t]he total fluorine method measures all forms of PFAS in the fibers and does not identify individual PFAS. It is an effective screening tool to detect intentionally added PFAS, and results should prompt a discussion with the supplier[.]"[33]

62. The Cancer Free Economy Network supports this conclusion, stating that "there are few standardized PFAS test methods." Accordingly, researchers may rely on "total fluorine tests [which] are indirect methods designed to measure a representative element indicative of PFAS."[34]

---

[30] *Id.*

[31] Ketura Persellin, "Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion," Environmental Working Group (Jan. 13, 2022), https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last accessed Feb. 28, 2023).

[32] Supply Chain Solutions Center, "Testing for PFAS in food packaging," https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/#:~:text=The%20total%20fluorine%20method%20provides,certification%20program% (last accessed Feb. 28, 2023).

[33] *Id.*

[34] Cancer Free Economy Network, "A Short Guide To Common Testing Methods For Per- And Polyfluoroalkyl Substances (PFAS)," https://www.bizngo.org/images/ee_images/uploads/resources/CFE_PFAS_Testing_FactSheet_Final.pdf (last accessed Feb. 28, 2023).



Deleted: Aug. 18, 2022

Deleted: Aug. 18, 2022

Deleted: .

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: S

Deleted: A

Deleted: – JURY TRIAL DEMANDED 17

Formatted: Border: Top: (No border)

63. Rainier Lohmann, Director of University of Rhode Island's Lohmann Lab supports these conclusions, stating that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."

64. Finally, at least one court has also determined that fluorine testing is an appropriate measure for testing for the presence of PFAS. *See GMO Free USA v. Cover Girl Cosmetics, et al.*, Case No. 2021 CA 004786 B (D.C. Sup. Ct. June 1, 2022) ("TFUSA plausibly alleges that the product contains PFAS based on its fluorine testing.").

**3. PFAS Migrate From Food Packaging to Food**

65. On March 3, 2020, a consortium of scientists released a report in *Environmental Health* called "Impacts of food contact chemicals on human health: a consensus statement."[35]

66. The scientists stated therein that "[w]e describe areas of certainty, like the fact that chemicals migrate from food contact articles into food."

67. The scientists explained that "[t]his phenomenon is known as migration and has been studied since the 1950s."

68. The scientists determined that "new-generation PFAS [like those found in food packaging] are more mobile than the old generation PFAS, they migrate more readily into food."

69. The scientists explained that "[c]urrent safety assessment of food contact chemicals is ineffective at protecting human health."

[35] Jane Muncke, Anna-Maria Anderrson, Thomas Backhaus, Justin M. Boucher, Bethanie Carney Almroth, Arturo Castillo Castillo, Jonathan Chevier, Barbara A. Demeneix, Jorge A. Emmanuel, Jean-Baptiste Fini, David Gee, Birgit Geueke, Ksenia Groh, Jerrold J. Heindel, Jane Houlihan, Christopher D. Kassotis, Carol F. Kwiatowski, Lisa Y. Lefferts, Maricel V. Maffini, Olwenn V. Martin, John Peterson Myers, Angel Nadal, Cristina Nerin, Katherine E. Pelch, Seth Rojello Fernandez, Robert M. Sargis, Ana M. Soto, Leonardo Trasande, Laura N. Vanderberg, Martin Wagner, Chanqing Wu, R. Thomas Zoeller, and Martin Scheringer, "Impacts of food contact chemicals on human health a consensus statement," *Environmental Health*, 2020 19:25, https://ehjournal.biomedcentral.com/track/pdf/10.1186/s12940-020-0572-5.pdf (last accessed Feb. 28, 2023).

Deleted: s

Deleted: visited Aug. 18, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 18

Formatted: Border: Top: (No border)

70. The scientists also explained that "reducing exposure to hazardous contact chemicals contributes to the prevention of associated chronic conditions in the human population."

71. The scientists stated that "[t]o summarize, we are concerned that current chemical risk assessment for food contact chemicals does not sufficiently protect public health."

72. The scientists stated that "[t]here is clear scientific evidence that chemicals migrate from food contact artifacts, and it is likely that the majority of the human population is affected by these exposures." Other researchers agree.[36]

**4. PFAS Are Incompatible With Human Health**

73. According to leading scientists, PFAS must be treated as a single class rather than treated individually: "While a class-based approach to chemical management can pose challenges to the traditional paradigm of individual chemical risk assessment, the extreme persistence and potential for harm from thousands of PFAS . . . . demands a more efficient and effective approach. Examples of cases in which substances with common characteristics are currently managed as a class include organophosphate pesticides, organchlorine pesticides, and organohalohen flame retardants."[37]

74. The scientists explained that "[t]o date, managing the risk of PFAS has focused primarily on one chemical at a time, or a small group of PFAS. This

---

[36] *See, e.g.*, Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last accessed Feb. 28, 2023).

[37] Carol F. Kwiatkowski, David Q. Andrews, Linda S. Birnbaum, Thomas A. Bruton, Jamie C. DeWitt, Detlef R. U. Knappe, Maricel V. Maffini, Mark F. Miller, Katherine E. Pelch, Anna Reade, Anna Soehl, Xenia Trier, Marta Venier, Charlotte C. Wagner, Zhanyun Wang, and Arlene Blum, "Scientific Basis for Managing PFAS as a Chemical Class," Environmental Science & Technology Letters (June 30, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00255 (last accessed Feb. 28, 2023).



Deleted: Aug. 18, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: S

Deleted: A

Deleted: – JURY TRIAL DEMANDED 19

Formatted: Border: Top: (No border)

approach has not been effective at controlling widespread exposure to this large group of chemicals with known and potential hazards."

75. The scientists stated that "assessing only small subgroups systematically ignores the majority of PFAS and underestimates the overall risk, particularly when many of the chemicals are unknown."

76. The scientists concluded that "[m]ore comprehensive solutions are needed, given that traditional approaches have failed to control widespread exposure to PFAS and resulted in inadequate public health protection."

77. In another publication, scientists wrote that "[w]hile in-depth information for each compound would be ideal for scientific understanding, it is not necessary for regulating or managing PFAS. Most importantly, it leads to undue and harmful delays in protecting human and ecological health."[38]

78. Other scientists agree, finding that "[w]e know that among the few PFAS that have been well studied, common or shared adverse effects have been observed."[39]

79. The scientists wrote that "[w]e are of the opinion that highly persistent PFAS are incompatible with green chemistry[40] principles and future visions of sustainable development."

[38] Carol F. Kwiatkowski, David Q. Andrews, Linda S. Birnbaum, Thomas A. Bruton, Jamie C. DeWitt, Detlef R. U. Knappe, Maricel V. Maffini, Mark F. Miller, Katherine E. Pelch, Anna Reade, Anna Soehl, Xenia Trier, Marta Venier, Charlotte C. Wagner, Zhanyun Wang, and Arlene Blum, "Response to 'Comment on Scientific Basis for Managing PFAS as a Chemical Class,'" *Environmental Science & Technology Letters* 2021, 195-197 https://pubs.acs.org/doi/pdf/10.1021/acs.estlett.1c00049 (last accessed Feb. 28, 2023).

[39] Ian T. Cousins, Jamie C. DewWitt, Juliane Gluge, Gretta Goldenman, Dorte Herzke, Rainier Lohmann, Carla A. Ng, Martin Scheringer, and Zhanyun Wang, "The High Persistence of PFAS is Sufficient for their Management as a Chemical Class," *Environ Sci. Process Impacts*, 2020 Dec. 16; 22(12): 2307-2312, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7784706/ (Feb. 28, 2023).

[40] According to the EPA, "[g]reen chemistry is the design of chemical products and processes that reduce or eliminate the use or generation of hazardous substances. Green chemistry applies across the life cycle of a chemical product, including its

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: s
Deleted: A
Deleted: – JURY TRIAL DEMANDED 20
Formatted: Border: Top: (No border)

80. The scientists wrote that "[e]ven if some PFAS are considered of low health concern, there may be starting materials, breakdown products and/or other PFAS by-products of higher concern released during their lifecycle (e.g. in the case of certain fluoropolymers) or they may be of high climate / environmental concern (e.g. in the case of perfluoroalkanes and perfluoro-tert-amines)."

81. The scientists stated that "despite their diversity, PFAS do share one common structural feature that make them highly problematic, namely the presence of perfluoroalkyl moieties, resulting in their shared resistance to environmental and metabolic degradation."

82. The scientists explained that the "concerns regarding the high persistence of chemicals" include "[i]ncreasing concentrations [that] will result in increased exposures and therefore increased probabilities for known and unknown health effects, be it by individual PFAS and/or in a mixture with other substances."

83. Indeed, the health effects associated with PFAS are well known. According to the Erika Schreder, Director of Science at Toxic-Free Future, "laboratory-based and epidemiological research has linked PFAS exposure to a number of serious health concerns. Primary among them are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."[41]

84. Several authorities support these conclusions as well as others.

85. The U.S. Agency for Toxic Substances and Disease Registry (ATSDR) recently updated its toxicological profile for PFAS. In the new draft document, the agency identified associations between human exposure to PFAS and the following health concerns: pregnancy-induced hypertension/per-eclampsia, liver damage,

design, manufacture, use, and ultimate disposal." See https://www.epa.gov/greenchemistry/basics-green-chemistry (Feb. 28, 2023).

[41] Erika Schreder and Jennifer Dickman, *Take Out Toxics: PFAS Chemicals in Food Packaging*, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2019/05/Take-Out-Toxics-Full-Report.pdf.



Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: S
Deleted: A
Deleted: – JURY TRIAL DEMANDED 21
Formatted: Border: Top: (No border)

increase in serum lipids, particularly total cholesterol, increased risk of thyroid disease, decreased antibody responses to vaccines, and risk of asthma.[42]

86. In laboratory animals, PFAS exposure leads to liver, developmental and immune toxicity, and cancer. The effects seen at the lowest exposure levels, identified by ATSDR, include changes to nervous system development, decreased survival of young, suppressed immune response, liver degeneration, and decreased fetal and birth weights.[43]

87. According to Dr. Linda S. Birnbaum, Scholar in Residence at Duke University, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences (NIEH) and National Toxicology Program: "[t]hese toxic chemicals are linked to serious health problems like cancer, liver damage, decreased fertility, and asthma . . . . PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."[44]

88. Others support these conclusions. In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[45]

89. The following figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[46]

---

[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last accessed Feb. 28, 2023).
[46] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Aug. 18, 2022).



Deleted: visited
Deleted: Aug. 18, 2022
Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: S
Deleted: A
Deleted: – JURY TRIAL DEMANDED 22
Formatted: Border: Top: (No border)

90. The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[47]

91. In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

92. As noted, the harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated by the figure below.[48]

[47] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Feb. 28, 2023).

[48] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Feb. 28, 2023).

Deleted: ¶

Formatted: Indent: Left: 0.5", No bullets or numbering

Deleted: Aug. 18, 2022

Deleted: Aug. 18, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 23

Formatted: Border: Top: (No border)




93. Mind the Store and Toxic-Free Future provide a similar graphic related specifically to PFAS in food packaging:



Deleted: ¶
¶

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 24

Formatted: Border: Top: (No border)

94. And, following their introduction, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.[49]

95. All of these harms outweigh the simple reason PFAS are used in food packaging in the first place which is simply to act "as a barrier to keep grease from escaping" and "from leaking into people's hands."[50]

96. But PFAS are not necessary for this intended outcome. Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no levels of organic fluorine.[51] Accordingly, Defendant would have had knowledge that it could produce the Product packaging without the heightened levels of fluorine and PFAS inherent in its current composition.

97. Yet, Defendant chose not to, and instead misrepresented this information to consumers, to increase revenues by the cost savings associated with the use of these chemicals.

98. This has not been without consequence to consumers, as fluorine and PFAS in food packaging migrates[52] onto the food, exposing consumers to both of these via ingestion.[53]

---

[49] *Id.*

[50] Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last accessed Feb. 28, 2023).

[51] *See supra* n. 5.

[52] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784 (last accessed Feb. 28, 2023).

[53] *See* Nat'l Toxicology Program, Per- and Polyfluoroalkyl Substances (PFAS), https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last accessed Aug. 18, 2022).

Deleted: concealed and affirmatively

Deleted: Aug. 18, 2022

Deleted: Aug. 18, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 25

Formatted: Border: Top: (No border)

99. Thus, Defendant's conduct has been substantially injurious to consumers, and is actionable.

**C. Defendant's Misrepresentation Are Actionable**

100. Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as safe and sustainable when they are not in fact safe and sustainable.

101. Plaintiffs and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product in packaging containing dangerous substances with well-known health and environmental consequences.

102. No reasonable consumer would expect that a product marketed as safe and sustainable would pose a risk to their health, safety, and wellbeing, or that it would contain dangerous levels of organic fluorine (indicator of PFAS), which are indisputably linked to harmful health effects in humans and the environment. Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Products.

103. As the Products expose consumers to organic fluorine/PFAS that pose a risk to consumers' health, the Products are not fit for consumption by humans. Plaintiffs and the Class are further entitled to damages for the injury sustained in being exposed to high levels of organic fluorine and toxic PFAS,; damages related to Defendant's conduct, and injunctive relief.

104. Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects. Nonetheless, Defendant affirmatively misrepresented the Product, as discussed herein.



**Deleted:** Glyphosate is a widely used pesticide that has been linked to cancer.[54]¶
Acetamiprid is a neonicotinoid insecticide, that has been labeled a "potential neurodevelopmental toxin[]."[55]¶
Chlorpyrifos is "an organophosphate pesticide that can permanently damage the developing brains of children, causing reduced IQ, loss of working memory, and attention deficit disorders."[56] In fact, "after a decades-long legal fight and under a court-ordered deadline, the U.S. Environmental Protection Agency has finally issued a final rule banning all food uses of chlorpyrifos."[57]¶
Isoprothiolane is a fungicide that is thought to pose a risk to aquatic ecosystems.[58] ¶
Tebuconazole is a fungicide that has been linked to reproductive harms in humans and toxic effects on aquatic life.[59] ¶
Tricyclazole is a fungicide that can lead to "decreased body weight gain and increased organ weights and others in the liver."[60]¶
Biocides with adverse effects on humans and the environment are not "safe" or "sustainable."¶
Likewise, consumers would not consider food contaminated with pesticide residue to be "healthy."[61]

**Deleted:** D

**Deleted:** `

**Deleted:** and Omissions

**Deleted:** and trace amounts of synthetic biocides

**Deleted:** and biocides

**Deleted:** ,

**Deleted:** and harmful biocides

**Deleted:** concealed and

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** s

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 26

**Formatted:** Border: Top: (No border)

105. Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the organic fluorine/PFAS and its failure to disclose the existence of organic fluorine/PFAS in the Product to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

106. **WHO**: Defendant made material misrepresentations of fact about the Product through in-store, website representations, and marketing statements, which include the statements that the Products are healthy, safe and sustainable. These representations constitute material misrepresentations regarding harmful chemicals in the Products packaging which is essential and integral to delivering the Products to the consumer.

107. **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because they misrepresented the Products as safe, healthy, and sustainable despite the fact that the Products contain organic fluorine indicative of PFAS that are widely known to have significant health repercussions. Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products are healthy, safe, and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

108. **WHEN**: Defendant made material misrepresentations during the putative class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products packaging contained harmful substances.

109. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions in in-store, website representations, and marketing statements.

Deleted: and harmful biocides,

Deleted: and harmful biocides

Deleted: and/or omissions

Deleted: omitted

Deleted: information

Deleted: omitted and concealed that the Product contains substances—organic fluorine. PFAS, and biocides—…

Deleted: and/or omissions

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 27

Formatted: Border: Top: (No border)

110. **HOW**: Defendant made material misrepresentations regarding the Product, including the presence of heightened levels of organic fluorine, indicating PFAS.

111. **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

112. **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendant's misrepresentations.

## CLASS ALLEGATIONS

113. Plaintiffs bring this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in California who purchased the Products (the "Class"). Excluded from the Class are persons who made such purchases for purposes of resale.

114. As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

115. At this time, Plaintiffs do not know the exact number of members of the aforementioned Class ("Class Members"). However, given the nature of the claims and the number of Defendant's restaurants in California selling Defendant's Product, Plaintiffs believe that Class Members are so numerous that joinder of all members is impracticable.

116. There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and facts common to Class

Deleted: and/or failed to disclose material facts

Deleted: , and trace amounts of harmful biocides.

Deleted: and/or omissions.

Deleted: TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS¶
<#>Defendant would have had actual knowledge for years that the Products packaging contains harmful chemicals such as organic fluorine/PFAS and biocides.¶
<#>Although Defendant was aware of the deception in its marketing and advertising given the inclusion of organic fluorine/PFAS and biocides in the Product despite claims of the Product's healthiness, safety and sustainability, they took no steps to warn Plaintiff or Class Members of risks related to organic fluorine/PFAS and biocides in the Products.¶
<#>Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products. Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product. ¶
<#>Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Products are healthy, safe and sustainable.¶
<#>Defendant concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.¶
<#>The organic fluorine and PFAS included in the formulation, design and/or manufacture of the Product packaging were not reasonably detectible to Plaintiffs and Class Members.¶
<#>The biocides included in the food Products were also not reasonably detectable to Plaintiffs and Class Members.¶
<#>At all times, Defendant actively and intentionally concealed the existence of the organic fluorine/PFAS and biocides and failed to inform Plaintiffs or Class Members of the existence of the organic fluorine/PFAS and biocides. Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.¶
<#>Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals.¶
<#>Defendant concealed or misrepresented the organic fluorine/PFAS and biocides for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.¶
<#>As a result of Defendant's active concealment of the organic fluorine/PFAS and biocides and/or failure to inform Plaintiffs and Class Members of the organic fluorine/PFAS and biocides, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Product. ¶
<#>Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Product contained heightened levels of organic fluorine/PFAS , which, at the very earliest, would have been in March 2022 following Consumer Report's highly publicized study, and trace amounts of biocid ... [1]

Deleted: the

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 28

Formatted: Border: Top: (No border)

Members predominate over questions that may affect individual Class Members include:

(a) whether Defendant misrepresented material facts concerning the Product;

(b) whether Defendant's conduct was unfair and/or deceptive;

(c) whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

(d) whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

117. Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class Members, purchased, in a typical consumer setting, Defendant's Product, and Plaintiffs sustained damages from Defendant's wrongful conduct.

118. Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, have retained competent counsel experienced in prosecuting class actions, and intend to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

119. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action

Deleted: and/or failed to disclose

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 29

Formatted: Border: Top: (No border)

device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

**COUNT I**
**(Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**

120. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

121. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

122. California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

123. By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

124. Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

125. As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers. In addition, Defendant have committed unlawful business practices by,

Deleted: ¶ <#>///¶ ///

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 30

Formatted: Border: Top: (No border)

inter alia, making the representations material facts, as set forth more fully herein, and violating the common law.

126. Plaintiffs and Class Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

127. Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**. Defendant's acts, misrepresentations, and practices as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

128. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein as noted above.

129. Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**. Defendant's claims and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

130. Plaintiffs and the other Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and misrepresentations about the defective nature of the Products, as discussed throughout.

131. There is no benefit to consumers or competition from deceptively marketing material facts about the true nature of the Product.

132. Plaintiffs and the other Class Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised,

Deleted: and omissions of
Deleted: omissions,
Deleted: and non-disclosures
Deleted: , nondisclosures
Deleted: omission
Deleted: and omitting
Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: s
Deleted: A
Deleted: – JURY TRIAL DEMANDED 31
Formatted: Border: Top: (No border)

packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

133. The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other California Subclass Members.

134. Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' and the California Subclass' attorneys' fees and costs.

**COUNT II**

**(Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)**

135. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

136. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

137. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

138. Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

Deleted: '

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 32

Formatted: Border: Top: (No border)

139. Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

140. Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as healthy, safe and sustainable, when in fact the Products are not healthy, safe, and sustainable and are instead, dangerous, and useless.

141. The Products are not safe because they contain an extraordinary level of fluorine and PFAS in the packaging which is essential and integral to the delivery of the Products to consumers that subject unsuspecting consumers to significant health risks.

142. Defendant knew that its representations were false. Specifically, Defendant displayed the Products and described the Products as healthy, safe and sustainable, including on the product packaging, on its website, and in its marketing, despite the fact that the Products were unsafe and detrimental to human health and the environment.

143. Plaintiffs and the Class Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

144. On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiffs had chosen not to wait for Defendant's response. Plaintiffs also chose not to wait for Defendant's response because Defendant has long known about its

**Deleted:** as well as biocide

**Deleted:** has exclusive knowledge of the Product's composition, which was not known to Plaintiffs or Class Members.¶
Defendant made partial representations to Plaintiffs and Class Members, while suppressing the true nature of the Products. ...

**Deleted:** by

**Deleted:** ing

**Deleted:** ing

**Deleted:** without disclosing

**Deleted:** Moreover, Defendant affirmatively misrepresented the Product despite its knowledge that the Product was not as advertised.

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** s

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 33

**Formatted:** Border: Top: (No border)

conduct as described herein. Thus, Plaintiffs' letter would not have served the purpose of the letter.

145. For those reasons, Plaintiffs filed their Complaint on April 27, 2022, seeking injunctive relief only under the CLRA. Defendant did not correct its practices.

146. Accordingly, Plaintiffs and the Class Members seek, in addition to injunctive relief, monetary damages from Defendant as permitted by Civil Code § 1782(a).

147. Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance, damages resulting from their purchases of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

148. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiffs and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

149. Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Products' packaging; (2) the removal of such chemicals from the Products' packaging, or (3) aligning Defendant's representations with its practices, or aligning its practices with its representations will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decisions about the



Deleted: '

Deleted: as well as biocide

Deleted: or

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 34

Formatted: Border: Top: (No border)

purchase price of the Products absent Defendant's misrepresentations with the full purchase price at their disposal.

**COUNT III**

**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

150. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

151. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

152. Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

153. The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

154. Plaintiffs and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

155. Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

156. Defendant impliedly warranted to retailer buyers that the Product was merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which



Deleted: omissions and

Deleted: ///¶ ///¶

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 35

Formatted: Border: Top: (No border)

the Product is used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product was unsafe for consumption after exposure to Defendant's packaging. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

157. Plaintiffs and Class Members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

158. The Products were not altered by Plaintiffs or the Class Members.

159. The Products were defective at the time of sale when they it the exclusive control of Defendant.

160. Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

161. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

162. On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter, apprising Defendant of its breach of warranties. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations. The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiffs have chosen not to wait for Defendant's response. Plaintiffs have also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein. Accordingly, Plaintiffs' letter would not have served the purpose of the letter.

163. Plaintiffs and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

Deleted: The issue as described in this complaint was latent in the product and not discoverable at the time of sale.…

Deleted: s

Deleted: s

Deleted: '

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

Deleted: ¶

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 36

Formatted: Border: Top: (No border)

**COUNT IV**
**(Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.*)**

164. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

165. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

166. Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public. As described above, and throughout this Complaint, Defendant misrepresented the Product as healthy, safe and sustainable when, in fact, the Product was not healthy, safe or sustainable.

167. By its actions, Defendant disseminated uniform advertising regarding the Product to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*. Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

168. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant held out the Products as healthy, safe and sustainable when in fact they are not, thereby posing a significant risk to the health and wellbeing of Plaintiffs and the Subclass Members as well as to the environment.

169. Defendant continues to misrepresent to consumers that the Products was safe and sustainable. However, as described, this is not the case.

170. In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiffs and other Class Members based their purchasing decisions on Defendant's misrepresentations. The revenue attributable to the Product sold in

Deleted: failed to disclose that the Products contain substances that pos

Deleted: e

Deleted: omitted material facts

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 37

Formatted: Border: Top: (No border)

those false and misleading advertisements likely amounts to tens of millions of dollars. Plaintiffs and Class Members were injured in fact and lost money and property as a result.

171. The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

172. As a result of Defendant's wrongful conduct, Plaintiffs and Class Members lost money in an amount to be proven at trial. Plaintiffs and Class Members are therefore entitled to restitution as appropriate for this cause of action.

173. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT V**
**(Fraud)**

174. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

175. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

176. At the time Plaintiffs and Class Members purchased the Products, Defendant misrepresented the Products as healthy, safe and sustainable.

177. Defendant affirmatively misrepresented the Products, giving the Product the appearance of a product that is indeed safe for use.

178. Defendant also knew that its misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations in making purchasing decisions.

Deleted: did not disclose, but instead concealed and
Deleted: ,
Deleted: omissions and
Deleted: (and corresponding omissions)
Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: s
Deleted: A
Deleted: – JURY TRIAL DEMANDED 38
Formatted: Border: Top: (No border)

179. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

180. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations in making their purchasing decisions.

181. Plaintiffs and Class Members had a right to reply upon Defendant's representations as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

182. Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT VI**
**(Constructive Fraud)**

183. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

184. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

185. At the time Plaintiffs and Class Members purchased the Products, Defendant misrepresented the Products as discussed herein.

186. Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed safe for consumption and otherwise sustainable.

187. Defendant also knew that its misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations in making purchasing decisions.

188. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

**Deleted:** (and corresponding omissions)

**Deleted:** (and corresponding omissions)

**Deleted:** omissions and

**Deleted:** did not disclose, but instead concealed and

**Deleted:** ,

**Deleted:** omissions and

**Deleted:** (and corresponding omissions)

**Deleted:** <#>Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiffs and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiffs and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.¶

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** S

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 39

**Formatted:** Border: Top: (No border)

189. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations in making their purchasing decisions.

190. Plaintiffs and Class Members had a right to rely upon Defendant's representations as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

191. Defendant breached its duty to Plaintiffs and Class Members to make full disclosures of the safety of their Product.

192. Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

**COUNT VII**
**(Fraudulent Inducement)**

193. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

194. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

195. Defendant misrepresented the Products as discussed herein.

196. Defendant knew, or should have known, that the Products were falsely portrayed as discussed throughout.

197. Defendant also knew that its misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendant's representations in making purchasing decision.

198. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

199. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations in making their purchasing decisions.

Deleted: (and corresponding omissions)
Deleted: (and corresponding omissions)
Deleted: omissions and
Deleted: , and Defendant's breach of its duty
Deleted: ¶ <#>¶
Deleted: did not disclose, but instead concealed and misrepresented, the Product…
Deleted: and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.…
Deleted: omissions and
Deleted: (and corresponding omissions)
Deleted: (and corresponding omissions)
Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: s
Deleted: A
Deleted: – JURY TRIAL DEMANDED 40
Formatted: Border: Top: (No border)

200. Plaintiffs and Class Members had a right to rely on Defendant's representations as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product, and because the representations concerned safety-related attributes of the Products.

201. Defendant intended to induce—and did, indeed, induce—Plaintiffs and Class Members into purchasing the Products based upon its affirmative representations.

202. Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

**COUNT VIII**
**(Fraudulent Misrepresentation)**

203. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

204. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

205. Defendant falsely represented to Plaintiffs and the Class that the Products were health, safe for use and otherwise sustainable.

206. Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

207. Defendant knew or should have known that its representations about the Products were false in that the Products are not healthy, not safe for consumption, and not sustainable as discussed throughout. Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

208. Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment. Given the deceptive manner in which



**Deleted:** (and corresponding omissions)

**Deleted:** and omissions.

**Deleted:** omission and

**Deleted:** COUNT VIII¶
(Fraudulent Concealment or Omission)¶
<#>Plaintiffs reallege and reincorporate by reference all paragraphs alleged above. ¶
<#>Plaintiffs bring this claim individually and on behalf of the Class. ¶
<#>At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.¶
<#>Defendant, acting through its representatives or agents, delivered the Product to its own distributors and various other distribution channels.¶
<#>Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.¶
<#>Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.¶
<#>Defendant made these material misrepresentations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company and that its Products are healthy, safe for use, and otherwise sustainable. The false representations were material to consumers because the representations played a significant role in the value of the Products purchased.¶
<#>Plaintiffs and Class Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout. Plaintiffs and Class Members had no way of knowing that Defendant's misrepresentations as to the Products, and had no way of knowing that Defendant's misrepresentations were misleading.¶
<#>Although Defendant had a duty to ensure the accuracy of the information regarding the Products, it did not fulfill these duties.¶
<#>Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products. Such benefits came at the expense of Plaintiffs and Class Members.¶
<#>Plaintiffs and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth. Plaintiffs' and class members' actions were justified given Defendant's misrepresentations. Defendant was in the exclusive control of material facts, and such facts were not known to the public.¶
<#>Due to Defendant's misrepresentations, Plaintiffs and Class Members sustained injury due to the purchase of the Products that did not live up to their advertised representations. Plaintiffs and Class Members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.¶
<#>Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. ... [2]

**Deleted:** IX

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** s

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 41

**Formatted:** Border: Top: (No border)

Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiffs' and the Class' reliance on Defendant's misrepresentations was justifiable.

209. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Products and that they do not conform to Defendant's advertising and marketing.

210. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

**COUNT IX**
**(Negligent Misrepresentation)**

211. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

212. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

213. Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

214. Defendant breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

215. Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant. Specifically, Defendant knew or should have known that the Product was not safe for use and not sustainable.

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)
Deleted: s
Deleted: A
Deleted: – JURY TRIAL DEMANDED 42
Formatted: Border: Top: (No border)

216. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not safe for consumption and that the Products do not conform to the Product's labeling, packaging, advertising, and statements.

217. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

**COUNT X**
**(Quasi-Contract / Unjust Enrichment)**

218. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

219. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

220. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

221. Plaintiffs and Class Members conferred benefits on Defendant by purchasing the Products.

222. Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members' purchases of the Product. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented its Products as safe, healthy, and sustainable, when they are not in fact safe, healthy, and sustainable. These misrepresentations caused injuries to Plaintiffs and Class Members because they would not have purchased the Product if the true facts were known.

223. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

**Deleted:** I

**Deleted:** failed to disclose that the Product was unfit for its intended purpose as it was unsafe for use. …

**Deleted:** omissions

**Formatted:** Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

**Deleted:** S

**Deleted:** A

**Deleted:** – JURY TRIAL DEMANDED 43

**Formatted:** Border: Top: (No border)

**COUNT XI**

**(Breach of Express Warranty)**

224. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

225. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

226. Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Product.

227. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products packaging and through marketing and advertising, as described above.

228. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

229. As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is otherwise sustainable.

230. Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

231. Defendant breached express warranties about the Products and its qualities because despite Defendant's warranties that the Products are safe for consumption and is otherwise sustainable the Product is objectively not in fact safe for use and not sustainable. Thus, the Product did not confirm to Defendant's affirmations and promises described above.

232. Plaintiffs and each Class Member would not have purchased the Product had they known the true nature of the Products.

233. On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter, apprising Defendant of its breach of



Deleted: I

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 44

Formatted: Border: Top: (No border)

warranties. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations. The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiffs had chosen not to wait for Defendant's response. Plaintiffs have also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein. Accordingly, Plaintiffs' letter would not have served the purpose of the letter.

234. As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel;

(b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper;

Deleted: s

Deleted: s

Deleted: '

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 45

Formatted: Border: Top: (No border)

(h) For medical monitoring as a means to safeguard Plaintiffs' and Class Members' health and to mitigate any damages for future medical treatment; and

(i) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: March 1, 2023

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
aleslie@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

Deleted: s

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 46

Formatted: Border: Top: (No border)

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Neil Hamman who resides in Ramona, California, and for Plaintiff Michael Stewart who resides in San Diego, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2. The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California. Additionally, Defendant transacts substantial business in this District, including purchases of the Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiffs in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 1st day of March, 2023..

*/s/ L. Timothy Fisher*
L. Timothy Fisher

Deleted: 18th

Deleted: August, 2022

Formatted: Centered, Border: Top: (No border), Bottom: (Single solid line, Auto, 0.5 pt Line width)

Deleted: s

Deleted: A

Deleted: – JURY TRIAL DEMANDED 47

Formatted: Border: Top: (No border)

**Page 28: [1] Deleted Sean L. Litteral 2/28/2023 2:01:00 PM**

**Page 41: [2] Deleted Sean L. Litteral 2/28/2023 2:20:00 PM**